## Gerlach et ux. *v.* Pittsburgh Railways Company, Appellant.

Argued April 27, 1928.

Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ.

*William A. Challener* for appellant.

*C. J. Tannehill,* and with him *Rody P. Marshall,* for appellees.

OPINION BY CUNNINGHAM, J., July 12, 1928:

Plaintiffs, husband and wife, brought their action in the court below to recover damages from the defendant company for personal injuries suffered by each of them, and losses and expenses occasioned the husband, through the alleged negligence of defendant's servants in failing to protect plaintiffs, while passengers upon one of its trolley cars, from assaults committed upon them during the progress of a brawl for which a group of disorderly young men, also passengers on the car, were responsible. Verdicts of $500 for the husband and $2,000 for the wife were returned. Defendant's motions for judgment n. o. v. and for a new trial having been overruled, judgments were entered upon the respective verdicts, from which we have these appeals by the defendant. There are but two assignments of error and under them no question is raised with respect to the right of the plaintiffs to recover compensatory damages under the facts developed in the testimony. The single question involved under the assignments is whether the trial judge was justified under all the circumstances of the case in charging the jury that it "might allow punitive damages." The proper disposition of this question necessarily involves a detailed consideration of the facts appearing from the evidence, for the conduct of those

in charge of this car, and particularly of its conductor, must be judged in the light of those facts.

Upon examining the record we find irreconcilable conflicts in the testimony, but for the purposes of this review we must resolve these conflicts in favor of the plaintiffs. By so doing we find the facts and inferences fairly deducible therefrom to be these: The plaintiffs, accompanied by the husband's brother, Maurice Gerlach, and the wife's stepfather and her mother, Mr. and Mrs. Coulter, boarded one of defendant's trolley cars about 11:45 P. M. on July 7, 1924, at the corner of Liberty Avenue and Stanwix Street in the City of Pittsburgh to go to their home at Ingram some miles out of the city. The car was of the center entrance type with the station of the conductor at the fare box in the center of the car and facing the entrance door. Immediately to the rear of the entrance doors there were a number of cross seats, each accommodating two passengers. Plaintiffs seated themselves in the first of these cross seats on the right side of the car and within a few feet of the conductor. Maurice Gerlach took the cross seat directly opposite and Mr. and Mrs. Coulter the one behind him. The seat immediately behind the plaintiffs was vacant. Shortly after the plaintiffs and their relatives entered the car and before it left its starting point four young men, whose ages ranged from eighteen to twenty-five years, and who were at least partially intoxicated, entered the car, seated themselves in the rear some distance behind plaintiffs, and began to make boisterous, profane and bantering remarks to each other. Elizabeth Gerlach was sitting next to the window and by reason of a severe headache had removed her hat and was resting her head against the side of the window. Her husband was reading a newspaper. In addition to those already mentioned there were but one or two other passengers.

With respect to the events which occurred within

the view and hearing of the conductor shortly after the car started, Maurice Gerlach testified that the young rowdies were bantering one another as to who would go up and pull Mrs. Gerlach's hair and continued: ''A. Then one fellow said—he took the banter for to pull my brother's wife's hair. Q. Where did he come to? A. He came to the second seat, in back of my brother, the first seat back of my brother. . . . . . . He kind of kicked the seat with his foot and he reached up and caught her by the hair and gave a yank. And I noticed it because I was watching that way, and I noticed him when he came up from the rear. Q. What did you do? A. I just waited a second and then he pulled it again, and then I looked over to him, 'Now, here, cut that out. I saw you do that.' '' After testifying to an obscene reply the witness proceeded: ''Q. In what sort of a tone did he say that? A. Loud enough for everybody to hear it. Q. Did the conductor say anything or do anything? A. The conductor didn't say anything. Q. Did he come back there? A. No; he didn't move from his stand. Q. Was that language used loud enough for the conductor to hear? A. Absolutely. Q. Did you say anything to the conductor? A. I said to the conductor, 'Why not put that man back where he came from, in the back of the car?' and he never paid any attention. He didn't say anything. Q. Which way was the conductor looking? Back towards you? A. Looking right to the front of the door, the opening of the door. Q. Didn't he even look back in the direction? A. No, he didn't pay any attention at all. Q. Well, what happened next following the time you told him to stop pulling her hair? A. Well, then, my brother got up from his seat and told him to go back again, and he wouldn't do it, and he struck at my brother, and my brother got hold of him and pushed him back about a seat or so from where he was sitting. Q. And was there any conversation or talk from your

brother to him or from him to your brother? A. He said, 'It is a——lie.' My brother asked him about pulling her hair and he said, 'It is a——lie.' He didn't pull it; and all this and that, and my brother said, 'You go back where you came from.' Q. When your brother pushed him back a seat or two, what happened after that; did he go back, or come up again? A. No, he went to the back of the car there and sat there." There was testimony that after this incident the man who had been pushed to the back of the car pointed at Maurice Gerlach and said, "I will get you when you get off."

When the car reached Corliss Station, about twenty minutes after it had left the city, the conductor opened the doors and the young men started to leave the car. As they passed along the aisle two of them assaulted the Gerlach brothers. Malcolm M. Gerlach's description of the assault, as contained in his testimony, was: "A. Well, about that time we landed at Corliss Station. The car stopped; evidently the boys lived there somewhere for four of them got up to get off, and as two of them passed, one grabbed me by the throat. ...... Q. Where were you when he grabbed you? A. In the seat. Q. The same seat? A. Yes; and the other boy, he struck my brother. Q. Do you know which one struck your brother? A. No. Q. Then what followed? ....... A. Well, there was a fight ensued or a scuffle started in the car, and of course, I had to defend myself, and my wife jumped up to grab me and hold me from fighting, and she kept saying all the way out, 'Don't fight, and don't get in no trouble.' And, of course, when these boys was hitting at me, the one that made the attack on me, he was pushing and shoving and the first thing I knew we were out in the street. Q. Did the conductor take any part in that? A. No, sir; he opened the doors to let us out and when we got on the street the fight

continued out there until I noticed my wife had been knocked unconscious. Q. You were engaged in a scuffle and fight. How about Maurice, was he in it? A. Yes, he was in it. Q. How many of these young men took part in that? A. Four of them, I believe. Q. How long were you scuffling inside of that car before you got out of the door? A. Well, it was some time, I should say three or four minutes. Q. Do you know how your wife got knocked out of the car or got knocked unconscious? A. I don't know, no. Q. Where was she when she was lying there? A. She was lying on the street next to the curbstone. Q. How far from the car? A. I should say a distance of four or five feet. It is a very narrow street there.'' The other plaintiff, Elizabeth Gerlach, after corroborating the testimony relative to the pulling of her hair and the assaults upon her husband and his brother, said: ''A. As he started to strike at Maurice, Malcolm went to get up and I asked him to stay in his seat, maybe they would get off, not to have any trouble with them. And he got up to defend himself and there was quite a scuffle there. Q. Did you get up? A. I did; yes, sir. Q. What did you do? A. I tried to get out of the seat I was in. Q. Well, did anything happen to you? A. I was pushed back into the seat, back against the window. Q. Who pushed you? A. I don't know. Q. Very hard? A. Quite hard; yes, sir. Q. Did you make an effort to get out? A. I made an effort to get out again and I was pushed against the pole on the corner of the front seat. Q. Against what? A. The pole that runs in front of the front seat, right at the edge. Q. You mean at the entrance? A. Yes, sir. Q. An iron pole? A. Yes, sir; a small pole. Q. Who pushed you against that? A. I don't know. The men that was scuffling. ...... I was really crushed against it and I couldn't get away. Q. How many of these men, including your

husband and Maurice, were engaged in that scuffle.
A. There were two of them fighting with Maurice
and Malcolm Gerlach and two right beside them, at-
tempting to get into it. ...... Q. How long did that
scuffling keep up in the car that you know of? A.
I would say five or six minutes. Q. And what hap-
pened to you after you were crushed against the pole?
A. I don't know much after that; I was knocked off
the car. Q. Who knocked you off the car? A. I
don't know. Q. Some of the men that were scuffling?
A. Yes, sir. Q. When you were knocked off the car
where did they knock you to? Did you strike any-
thing? A. Yes, sir; I struck a pole. Q. What kind
of a pole was that? A. It is an iron pole, about that
big around (indicating). Q. How big through would
it be? A. Oh, five inches. ........ I just hit it hard
and I don't know any more."

The husband's thumb was injured to an extent that
interfered with his earnings as a professional musician
for several weeks and the wife received serious in-
juries which confined her to bed and resulted in a mis-
carriage a few days after the assault. The measure
of defendant's duty to plaintiffs as orderly passengers
upon one of its cars is clearly defined in our decided
cases. In Pittsburgh and Connellsville Railroad Co.
v. Pillow, 76 Pa. 510, a fight occurred in a coach of
the defendant company, resulting in serious injuries
to plaintiff, an innocent passenger. Our Supreme Court
said that there was no distinction between accidents
arising from negligence in the equipment or manage-
ment of the train and those resulting from the miscon-
duct of passengers on it; that the employes of the
road had control and power over passengers and were
just as responsible for its proper exercise as they
were for the proper running of the train. The opinion
concludes with this statement of the rule: "The plain-
tiff lost his eye through the quarrel of a couple drunken
men, who should not have been permitted aboard the

cars, or if so permitted, should have been so guarded or separated from the sober and orderly part of the passengers that no injury could have resulted from their brawls. The duties and powers of conductors are very clearly pointed out by Justice WOODWARD in the case of the Railroad Co. v. Hinds, 3 P. F. Smith 512, in which he says: 'They may stop their trains and call to their assistance, for the purpose of suppressing riotous conduct on board thereof, not only all the employes, but also all passengers that are willing to lend a helping hand, and until the utmost effort has been made for that purpose, the responsibility of the company, which they represent, for damage sustained by orderly passengers remains.' We have a similar ruling in the case of Flint v. Norwich & New York Transportation Co., 34 Conn. 554, in which it is held that it is the duty of passenger carriers to repress all disorderly and indecent conduct in their cars, and that persons guilty of rude or profane conduct should be at once expelled. Such is the doctrine of the books. It is wise and good, and necessary for the protection and comfort of those who travel upon our railway lines, and who, from the very character of the means used for their transportation, are, during such transportation, almost wholly dependent upon the railway officers for their safety and well-being." In Barlick v. Balt. & Ohio R. R. Co., 41 Pa. Superior Ct. 87, our present President Judge PORTER said: "Conductors on trains have authority to exercise reasonable control over the passengers and are responsible for the exercise of that authority. It is their duty to repress disorder upon the trains, and in case there is any reasonable ground to apprehend that other passengers may suffer physical injury from the violence of disorderly passengers it is their duty to use every means at their command to protect other passengers and restrain, and if necessary remove from the train the disorderly parties: Kennedy v. Pennsylvania Rail-

road Company, 32 Pa. Superior Ct. 623; Railway Co. v. Hinds, 53 Pa. 512. The carrier is not liable for the negligent or unlawful act of a passenger which may result in an injury to a fellow passenger, upon the principle of respondeat superior. The carrier is, however, liable for injuries to a passenger resulting from the negligent or unlawful acts of a fellow passenger if prior to the accident the conduct of the offending party has been such as to indicate a disposition to indulge in physically violent conduct and give rise to a reasonable apprehension of injury to other parties. This is not upon the ground that the company is liable to answer for the acts of all those whom it undertakes to carry, but it is because of the failure of the duty to afford reasonable and proper protection to other passengers. The carrier is not bound to provide against contingencies which it had no reasonable grounds to apprehend, nor is it bound to protect its passengers from rudeness or bad manners on the part of strangers or other passengers, unless such conduct amounts to a breach of the peace: Ellinger v. Philadelphia, Wilmington and Baltimore Railroad Co., 153 Pa. 213; Graeff v. Philadelphia and Reading Railroad Co., 161 Pa. 230." On the other hand in Hillebrecht v. Pittsburgh Rys. Co., 55 Pa. Superior Ct. 204, in which the plaintiff was injured by a blow delivered suddenly and without any warning by a fellow passenger, the same writer, speaking for this court, placed this limitation upon the rule: "A carrier is not liable for injuries to a passenger resulting from the negligent or unlawful acts of a fellow passenger unless prior to the act which causes the injury the conduct of the offending party has been such as to give rise to a reasonable apprehension of injury to other parties: Barlick v. Baltimore & Ohio R. R. Co., 41 Pa. Superior Ct. 87. There was in the present case but one blow struck and that blow was struck suddenly and without warning, by a passenger who up to that moment had

been quiet and orderly. The thing was so quickly done that neither the conductor nor the friends of the plaintiff who were standing in the aisle of the car could have prevented it. The conduct of those in charge of the car must be judged in the light of the facts established by the evidence.'' Applying the rule to the evidence in the present case it is readily seen that, if a jury accepted the version of the plaintiffs, it would be warranted in awarding compensatory damages. It is true that the assaults at Corliss upon plaintiff and his brother, in which the injuries were received, came with a certain degree of suddenness. The disorderly passengers seem to have quieted down after the hair pulling incident and it may fairly be doubted whether the conductor heard the threats against the Gerlach brothers testified to by some of the witnesses. His version of the affair reads: ''Q. When this fuss started at the open doorway of this car where were you standing? A. I was sitting right on my seat, taking up fares. Q. And did you have any idea from the actions of these people up to that moment there was going to be any fuss or fight? A. Certainly not. I thought the thing was all over and everything was nice and quiet, and on the way out from the city, out to Corliss, I thought the thing was all settled, and over with; it never struck my mind the thing would start again and I wasn't even thinking of such a thing.''

The jurors were not bound to accept this explanation of the conductor's neglect to protect his passengers from the assaults and of his supine and apparently cowardly failure to assist them when attacked. In the language of the opinion in Barlick v. Balt. & Ohio R. R. Co., supra, the prior conduct of these offending parties had been such as to indicate a disposition to indulge in physically violent conduct and to give rise to a reasonable apprehension of injury to other parties. There are a number of circumstances which

exclude this case from the limitation of the rule announced in Hillebrecht v. Pittsburgh Railways Co., supra. It does not follow however that this is a case in which the trial judge was warranted in instructing the jury that it might award punitive damages. This question seems to have been injected into the case by plaintiffs' counsel at the close of the regular charge and in response to the inquiry of the trial judge whether there had been any omissions to which counsel desired to direct the attention of the court. Counsel for plaintiffs then asked, "Does the court wish to charge on the matter of punitive damages?" to which the trial judge replied, "Well, the question of punitive damages has been raised in this case, and punitive damages are allowed not only by way of compensation, but by way of punishment to deter the defendant and others from offending in like cases. If you feel in this case that the defendant is guilty, you might allow punitive damages." Apparently being apprehensive that this instruction was inadequate, counsel for plaintiffs said, "With reference to the point I mentioned as to punitive damages: I would like to ask the Court to say that if the jury believes from the testimony that the defendant's servants and operators of this car so negligently performed their duty as to indicate a wanton disregard of the rights of these plaintiffs, then the jury may allow punitive damages and are not restricted to compensation only," to which the court replied, "I would say to you, as a matter of law, if you find this street car was operated by the defendant's conductor in such a way as to amount to wantonness on his part, and that the injuries thereby resulted and were cause by this wantonness, that then the company would be responsible for punitive damages as well as compensatory damages." These instructions are assigned for error and the question raised by them is not primarily whether the instructions were adequate but rather whether there was

any evidence justifying the submission of the question.

In its consideration several important distinctions and principles must be kept in mind. We are here dealing with a case between a carrier and its passengers and with a case where the ground for recovery pleaded in the statement and proved at the trial was the failure of a servant to act when he should have acted and not a willful or malicious act by the servant to the injury of the passengers. It is not suggested that the conductor participated in the assaults, nor is it averred in the statement of claim that his conduct was willful or malicious. All that is there charged is mere negligence in failing to protect his passengers by remonstrating with the disorderly persons or ejecting them from the car. Nor is there any suggestion that the inaction of its servants was authorized or approved by the defendant company. As was said by our Supreme Court in Funk v. Kerbaugh, 222 Pa. 18, too great caution cannot be exercised in permitting the recovery of punitive damages, even for the willful or reckless act of a servant not authorized or approved by the master. But where the evidence is sufficient such damages may be recovered. "It seems to be settled by the preponderance of authority in this country that, in actions against corporations for injuries received through the negligence of their servants, exemplary damages may be recovered when the injuries are wanton and malicious or are inflicted in a gross or outrageous manner, whether the act was previously authorized or subsequently ratified by the corporation or not": Philadelphia Traction Company v. Orbann, 119 Pa. 37; Artherholt v. Erie Electric Motor Company, 27 Pa. Superior Ct. 141, and cases there cited. It is the duty of the court to determine the question of the kind of damages that may be awarded under the evidence by the jury (Greeney v. Penna. Water Co., 29 Pa. Superior Ct. 136), and it is error to leave the question of punitive damages

to the jury when there is no evidence which would warrant a verdict other than one for compensatory damages: Pittsburgh Southern Rwy. Co. v. Taylor, 104 Pa. 306. Such cases as Philadelphia Traction Company v. Orbann, supra, in which the jury found a conductor had pushed a newsboy off a street car, and Greenwood v. Union Traction Company, 30 Pa. Superior Ct. 488, where a conductor, in refusing admittance to an intending but intoxicated passenger, pushed him on the breast so that he fell to the street, and Adams v. Beaver Valley Traction Co., 41 Pa. Superior Ct. 403, in which a passenger was violently ejected, (in all of which it was held that no ground existed for the recovery of punitive damages) are illustrations of the extent to which the testimony must go before a trial judge may properly submit the question of punitive damages to a jury. There must be evidence of willful misconduct—for instance, the striking of a passenger on the forehead and kicking him in the stomach (Artherholt v. Erie Electric Motor Company, supra); refusing to put off a passenger's baggage at a station at which he had alighted (P. C. and St. L. Rwy. Co. v. Lyon, 123 Pa. 140); and ejecting passengers at points distant from stations and in dangerous surroundings—or that entire want of care which would raise a presumption of "conscious indifference to consequences." In Greenwood v. Union Traction Co., supra, Judge PORTER, speaking for this court said: "When these principles are applied in an action for personal injuries suffered by the negligence of a servant, it is evident that, in order to permit of a recovery of exemplary damages, there must be actual malice, or such a reckless and conscious indifference to the rights of others as would, in a criminal proceeding, sustain an inference of legal malice."

In Pittsburgh and Connellsville Railroad Company v. Pillow, supra, and in Pittsburgh, Ft. Wayne and

Chicago Railway Co. v. Hinds, 53 Pa. 512, in which passengers were injured by disorderly fellow passengers the question of punitive damages does not seem to have been raised. Apparently the single case in this state between carrier and passenger, in which a recovery of exemplary damages for personal injuries suffered at the hands of a member of the crew or of a fellow passenger was sustained, is Artherholt v. Erie Electric Motor Company, supra. It was there held that under the circumstances disclosed by the evidence it was proper to permit the jury to award punitive damages. President Judge RICE, after stating that there was evidence from which the jury "could have found that the conductor, being angered by the plaintiff ringing the signal bell, or by mistake pulling the cord which registered fares, made a wanton and malicious assault upon him" and after a comprehensive review of the cases, affirmed the action of the trial judge in submitting the question of punitive damages to the jury. The evidence in that case however showed that in the assault made upon the passenger there were present the ingredients of legal malice. From a consideration of all the testimony for the plaintiffs in this case, the material portions of which we have quoted, a majority of the members of this court are of opinion that there is nothing in it from which a jury could reasonably find that the failure of the servants of defendant to perform their legal duty to plaintiffs was actually wanton or malicious, or that the conduct of either of them showed that reckless and conscious indifference to plaintiffs' rights from which wantonness or legal malice might be inferred. As we view this case their conduct amounted to no more than that degree of negligence which would subject their employer to liability for compensatory damages. It was error to instruct this jury that it "might allow punitive damages."

Considering the serious nature of the injuries suf-

fered by the wife, we have no way of ascertaining definitely how much of her verdict of $2,000 was intended as compensation and what part, if any, as punishment for the defendant. If it were clear here, as it was in Hoffman v. Berwind-White Coal Mining Company, 265 Pa. 476, and in Adams v. Beaver Valley Traction Company, supra, (where the verdict was only $100), that the jury had not included any exemplary damages in either verdict, we would be performing our whole duty by pointing out the error in the instructions without reversing the judgments. Unless reflected in the verdict such error would be harmless. Under all the circumstances here appearing, we think we must assume that the error disclosed by this record "may have infected" at least one of the verdicts (Pittsburgh, Ft. Wayne and Chicago Rwy. Co. v. Hinds, supra,) and upon this assumption direct a new trial.

The judgments are reversed with a venire.