John W. SKEELS
v.
UNIVERSAL C. I. T. CREDIT CORPORATION, Appellant,
v.
Estelle A. SKEELS, Third-Party Defendant.
No. 14719.

United States Court of Appeals
Third Circuit.

Argued June 2, 1964.

Decided Aug. 10, 1964.

---

Bernard G. Segal, Philadelphia, Pa., for appellant (Samuel D. Slade, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Attys., on the brief).

Thomas H. Cauley, Elmer G. Klaber, Pittsburgh, Pa., for appellee (Cauley, Birsic & Clarke, Pittsburgh, Pa., Frank & Klaber, Pittsburgh, Pa., Attys., on the brief).

Before BIGGS, Chief Judge, and HASTIE and GANEY, Circuit Judges.

HASTIE, Circuit Judge.

This is an appeal from a judgment entered on a verdict for $55,000 actual damages and $50,000 punitive damages in favor of the plaintiff Skeels, a franchised Chrysler automobile dealer in the Pittsburgh area, against Universal C. I. T. Credit Corporation, hereinafter abbreviated "UCIT", the financing agency which served the Skeels dealership. Skeels alleged and, in the view of the jury, proved that willful tortious conduct

of UCIT had destroyed his business.[1] The only question presented by this appeal is whether the district court erred at the conclusion of the trial in refusing to enter judgment for UCIT generally, or at least on the claim for punitive damages, in accordance with UCIT's earlier motions for a directed verdict and for dismissal of the complaint.

The record shows that the business of UCIT as a lending agency included the financing of dealers' purchases of new cars from automobile manufacturers and of installment sales from dealers to retail automobile purchasers. Under a 1959 agreement UCIT loaned Skeels $25,000 for operating capital and became his sole source of wholesale financing for new cars that became his stock in trade. The agreed procedure was that UCIT would pay the manufacturer, Chrysler, for cars delivered to Skeels and take trust receipts as evidence of its security interest in the cars. The financing documents empowered Skeels to sell such cars free of encumbrance, or "out of trust", to retail purchasers and required that after each such retail sale Skeels should hold in trust for and pay to UCIT "forthwith" the amount it had advanced to finance Skeels' purchase of that vehicle. UCIT was also authorized to take possession of all trusted cars held by Skeels whenever Skeels should fail to pay for any car as required.

It was the custom of UCIT to send a representative to make frequent "car checks" at each dealership to determine whether payments were being made promptly to the financing agency as cars were sold. If a car check showed that any car or cars had been sold out of trust without the required reimbursement to UCIT, payment or a safeguarding arrangement acceptable to UCIT was required and obtained without further delay.

On Friday, November 25, 1960, a car check showed that within the preceding week or two Skeels had sold 4 or 5 cars for which he had not made the required payments to UCIT. Continuation of the check through Monday, November 28, established that 9 cars had been thus sold out of trust and that Skeels was unable to pay UCIT almost $25,000 due it on account of these sales. Neither had Skeels made or tendered any satisfactory arrangement covering that delinquent obligation, though he was trying to borrow more money.

Accordingly, on November 28, UCIT took possession of Skeels' place of business for the time being, made a detailed examination of his records, and seized and removed trusted cars constituting his entire stock in trade. The seized cars were removed to the neighboring streets and the entire matter was handled in a way that created considerable confusion and attracted public attention around Skeels' place of business.[2] Late the following day, the UCIT representatives, having completed their mission, turned the premises back to Skeels. On November 30, the parties and counsel discussed at length the matter of possible additional loans from UCIT to Skeels, but these talks were unproductive. Thereafter, although he was still a franchised Chrysler dealer, Skeels had no stock in trade, and the rather sensational repossession of his recent stock may well have so damaged his good will and his credit standing as to make his franchise of little value. In any event, he was unable to finance new

1. This court has recently had occasion to recognize the progressive development, in Pennsylvania and elsewhere, of the concept of liability for willful unprivileged interference with prospective economic advantage. Bruce Lincoln-Mercury, Inc. v. Universal C. I. T. Credit Corp., 1963, 3 Cir., 325 F.2d 2, 13.

2. A police captain supplied this picture of the situation outside the Skeels agency during the afternoon of November 29:

"[I observed] quite a turmoil, arguments, vehicles all over the highway and streets * * *."

"Later they were taken from the streets. I was concerned in removing them as soon as possible because there was five alleys blocked, garages, driveways were blocked, the people who lived in Ingram had no opportunity at all to place their vehicles on the street * * *."

acquisitions. In the circumstances, the Skeels dealership never reopened.

If this were the entire story, it would be clear that injury to Skeels' business resulting from repossession of his stock in trade would not be actionable. For the sale of 9 cars out of trust, followed by inability to pay UCIT some $25,000 owed on account of those vehicles, was a serious breach of the financing agreement. And under the terms of the agreement it was entirely proper that upon such default UCIT protect itself by seizing all cars in Skeels' possession in which it had a security interest.

However, Skeels claims that two additional factors in this case made the seizure of his stock a willful wrong. First, he argues that his delay of a week or two in paying for the cars sold out of trust in November was not such a default as would justify seizure of his remaining stock of cars because UCIT had repeatedly acquiesced in similar delays in payment, contrary to the strict terms of the financing agreement. In this connection, we have examined all of the evidence concerning the conduct of UCIT in other cases where a car check disclosed that cars covered by trust receipts were not on the premises and had not been paid for. In each such case, however, UCIT required Skeels either to pay at once as then demanded, or to establish the whereabouts and continuing availability of the vehicle, or to provide forthwith a satisfactory arrangement or security for payment. At most, these cases showed a willingness to permit Skeels to delay payment or an equivalent arrangement satisfactory to UCIT until the next car check after a retail sale. In no case where a car check had established that a car had in fact been sold out of trust to a retail purchaser did UCIT agree that Skeels have more time to work out some arrangement that would provide or secure the sum due UCIT on account of that sale. Here, 9 cars had been sold out of trust within a two-week period and Skeels admittedly could not pay UCIT for them. Indeed, he was asking UCIT to lend him more money. No comparable situation had arisen in the past and there was nothing in the course of past dealing between the parties which could have created a reasonable expectation that in such circumstances payment would be deferred. The record does not support Skeels on this point.

There is another reason, in the appellee's view, why the action of UCIT was unjustified and a willful wrong. The record clearly shows that during the weeks immediately preceding the default in controversy Skeels had been negotiating with UCIT for additional financing. The Skeels agency was within the territorial jurisdiction of UCIT's Pittsburgh North Hills branch office. Skeels dealt for the most part with John Modrak, the manager of that branch office. In late August or early September, Skeels and Modrak first discussed the need for and desirability of increasing UCIT's outstanding capital loan to Skeels, less than half of which had been repaid, by about $15,000. Subsequently, an application for this new financing was formalized and, during the second week in November, was transmitted to the UCIT home office in New York, with approval recommended by Modrak and by his superior in charge of the divisional office with jurisdiction over the Pittsburgh area.

This application was rejected by the home office on November 22, but with the recommendation that $4,000 be advanced to Skeels on the security of used cars, and Modrak was so advised. However, when Skeels' stock in trade was seized a week later, he had still not been informed of this rejection.

In the meantime, beginning November 10, frequently thereafter and as late as November 28, according to Skeels' testimony, Modrak had assured him that the additional capital loan as originally requested would be forthcoming very soon. Modrak denied giving such assurance, although he conceded that he may not have told Skeels that the home office had rejected his loan application. In any event, Modrak and Skeels both testified that on November 25, the day that a car check showed 4 or 5 units out of trust, Modrak

went to Skeels to discuss just such a loan on the security of used cars as the home office had suggested in lieu of the rejected new capital loan. Skeels, however, uninformed of the home office action, viewed the used car loan as a source of urgently needed operating funds in addition to the anticipated proceeds of the requested capital loan. Accordingly, appropriate documents, including trust receipts covering the used cars, were executed that afternoon by Skeels in order to obtain a $10,000 used car loan. Skeels testified that Modrak represented that he was authorized to make this used car loan and that it would be made promptly. On Monday, November 28, according to Skeels, Modrak explained that the absence of clerical staff over the weekend had delayed the $10,000 loan, but that "it would be in before the day was out". While Modrak admitted the discussion and processing of this loan, his version was that its granting was understood to depend upon Skeels' obtaining from some source other than UCIT about $14,000 to pay for the 4 or 5 cars discovered on November 25 to have been sold out of trust. Yet, by his own admission, he had not told Skeels that the requested capital loan, which would have covered those cars, had been rejected. Finally, on November 28, while the Skeels-Modrak negotiations were still in progress, other representatives of UCIT took possession of the Skeels premises in order to seize and remove Skeels' entire stock in trade.[3]

Also relevant is Skeels' testimony that on November 10 he had expressed concern to Modrak about "accounts payable * * that should be paid now", and Modrak replied: "Go ahead and start paying them. I will have the [capital loan] check here for you any day now". Acting upon this assurance, Skeels testified that he proceeded to use such funds as were then available to him to pay his trade accounts. The amount thus used does not

appear, although the monthly operational expenses of the agency are disclosed as between ten and eleven thousand dollars.

■ On this appeal UCIT argues that it is simply incredible that Modrak would assure Skeels that the capital loan would be forthcoming after Modrak knew that the loan application had been rejected and that the car check had revealed a serious default by Skeels. But Modrak's admitted failure for an entire week to tell Skeels that the loan had been denied is almost as strange as the disputed continuing affirmative assurance that it would be forthcoming. In our view, a conclusion that the Skeels version of the Skeels-Modrak conversations merited belief and that the Modrak version did not, was within the bounds of rational fact finding. The jury must be taken to have resolved this issue of credibility in favor of Skeels. It would not be proper for us to disturb the jury's finding. Eastern Express, Inc. v. Mack Warehouse Corp., 3d Cir. 1964, 326 F.2d 554.

■ More generally, the jury, crediting Skeels' testimony, could permissibly have concluded that Skeels left the dealership on the afternoon of November 28, a short time before the arrival of UCIT's foreclosing personnel, believing by reason of Modrak's conduct and assurances that UCIT was completing favorable action on approximately $25,000 of additional loans which would enable him to meet his current obligations to UCIT. Our question then is whether the assurances given and the reasonable expectations created by Modrak could make tortious the otherwise proper action of UCIT in foreclosing on its security without notice or opportunity to seek other financing.

Both parties recognize that the rights of a secured creditor in Pennsylvania, where the relevant events occurred, are defined and controlled by the Uniform Commercial Code. Title 12A, Purdon's Pennsylvania Statutes. One of the gen-

3. Decision to take drastic action apparently had been reached November 25. On that day, without Skeels' knowledge, UCIT requested Chrysler to stop shipping cars to Skeels under the financing arrangement and instructed its own regional office not to release approximately $7,000 credited to Skeels in a reserve account.

eral provisions of the Commercial Code is that "[e]very contract within this Act imposes an obligation of good faith in its performance or enforcement". 12A P.S. § 1–203. It is also noteworthy that section 1–103 of the Commercial Code provides that principles of "equity" and "estoppel" "shall supplement" the Code provisions. These provisions superimpose a general requirement of fundamental integrity in commercial transactions regulated by the Code. In the present case a jury could not easily avoid the conclusion that it would be grossly improper and inconsistent with good faith dealing for a secured creditor, aware that his debtor had defaulted on currently due loan repayments, to persist in assurance that he was about to make further advances of needed operating capital, and then, without notice, exercise his security rights to seize the delinquent debtor's entire stock in trade. UCIT argues that this is beside the point because any assurance of further financing was first made before knowledge of the default. But, as we have pointed out, Skeels testified that the used car loan was proposed by Modrak with knowledge that at least 4 or 5 cars had been sold out of trust, and that assurances that the capital loan would be forthcoming were also given at that time and renewed even a few hours before the seizure. Moreover, the jury could reasonably have concluded that UCIT knew or should have known that its rather dramatic and ostentatious seizure and removal of all automobiles from the Skeels sales agency would as a practical matter destroy the already financially embarrassed enterprise. Normally, this unfortunate consequence would not make illegal the creditor's assertion of its security rights. But here the creditor's agent at least had lulled the financially embarrassed debtor into a false sense of security. Beyond that, Modrak's suggestion on November 10 that Skeels use his available funds to pay general obligations, in anticipation that an additional loan of operating capital would soon be forthcoming, may well have impressed the jury as an entrapment of Skeels into a course of conduct which resulted in his inability promptly to meet at least a substantial part of his subsequent obligations to UCIT. It is to be remembered that almost all of the sales of cars out of trust upon which the seizure was based occurred after this November 10 suggestion.

■ We have not overlooked a point made by UCIT that Skeels knew that Modrak had no authority to make capital loans but could only submit such matters to the home office for decisive action. But this knowledge was not inconsistent with reasonable reliance by Skeels upon assurances by Modrak, the officer in charge of UCIT's local office, that action upon a particular application would be prompt and favorable. Modrak was the responsible representative of UCIT with whom Skeels normally and continuously dealt and through whom the views and wishes of UCIT were normally expressed. Such a local officer would frequently learn, whether by written or telephonic communication, the views of the home office on a loan application before the applicant himself was formally advised. Indeed, this actually occurred here. In these circumstances, UCIT cannot avoid legal responsibility for Modrak's assurances as factual representations of an apparently knowledgeable agent for his principal. It was, of course, for the jury to determine, within this legal concept of responsibility, what assurances were given and how a reasonable man would respond to them.

■ We come now to the question whether the circumstances of this case warrant an award of punitive damages. Many jurisdictions will not permit punitive damages against a corporation, or any other principal, for misconduct of a servant or agent unless the situation is one in which it can fairly be said that the principal has sanctioned the misconduct or should have known that the wrongdoer was an unsuitable employee. Lake Shore & Michigan Southern Ry. v. Prentice, 1893, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97; General Motors Acceptance Corp. v. Froelich, 1959, 106 U.S.App.D.C. 357,

273 F.2d 92; Lightner Mining Co. v. Lane, 1912, 161 Cal. 689, 120 P. 771; Ketchum v. Amsterdam Apts. Co., 1920, 94 N.J.L. 7, 110 A. 590; Wright v. E–Z Finance Co., Tex.Civ.App., 1954, 267 S.W. 2d 602; RESTATEMENT, TORTS § 909. But Pennsylvania is less restrictive in permitting a punitive award against a corporation for an employee's tort. The leading case of Lake Shore & Michigan So. Ry. v. Rosenzweig, 1886, 113 Pa. 519, 544, 6 A. 545, 553, states and applies the rule that a "corporation is liable for exemplary damages for the act of its servant, done within the scope of his authority, under circumstances which would give such [a] right to the plaintiff as against the servant". Accord, Philadelphia Traction Co. v. Orbann, 1888, 119 Pa. 37, 12 A. 816; Gerlach v. Pittsburgh Rys., 1928, 94 Pa.Super. 121. But, recognizing the harshness of this rule, the Supreme Court of Pennsylvania has warned that "too great caution cannot be exercised in permitting the recovery of punitive damages for the willful or reckless act of a servant not authorized or approved by the master". Funk v. Kerbaugh, 1908, 222 Pa. 18, 19, 70 A. 953, 954. The sum of the matter seems to be that the conduct of the agent who inflicts the injury complained of must be rather clearly outrageous to justify the vicarious imposition of exemplary damages upon the principal. Chambers v. Montgomery, 1963, 411 Pa. 339, 192 A.2d 355.

██ In this connection, the present case is an odd one. Damages are sought for the acts of UCIT's employees who seized Skeels' stock in trade. Yet, neither these employees nor their superiors who authorized the seizure acted in an outrageous way. They undertook to exercise UCIT's security rights against a defaulting borrower as provided in the basic financing agreement. There is no indication or even suggestion that this was done with knowledge of the repeated assurances, inconsistent with that action, which another employee, Modrak, had given Skeels. Certainly, punitive damages could not have been imposed upon the individuals who directed or carried

out the seizure, as the financing agreement seemed to authorize. In these circumstances, it is only by associating Modrak's awareness of the assurances he had given with the otherwise proper conduct of persons uninformed of what Modrak had said that wanton or outrageous behavior can be attributed to the corporation. Established doctrine of respondeat superior may result in corporate liability for what the right hand thus did in ignorance of inconsistent behavior of the left. But to telescope the two in order to characterize as outrageous what was, at worst, done in excusable ignorance of certain events, is in our view unwarranted. Pennsylvania goes farther than many other states in imposing punitive damages, but we think it does not go this far.

It follows that the judgment of the district court must be modified by the elimination of the $50,000 awarded as punitive damages. Otherwise, we find no error.

The judgment of the district court will be vacated and the cause remanded for the entry of a judgment corrected in accordance with this opinion. Neither party shall be awarded costs in this court as against the other.