**June I. ROSSMAN, Plaintiff,**

v.

**K MART CORPORATION, Defendant.**

**Civ. A. No. 86–0952.**

United States District Court,
M.D. Pennsylvania.

June 6, 1988.

Lee H. Roberts, Lock Haven, Pa., for plaintiff.

Michael M. Badowski, Foulkrod, Reynolds & Havas, P.C., Harrisburg, Pa., for defendant.

## MEMORANDUM

RAMBO, District Judge.

Plaintiff filed this personal injury action as a result of an incident that occurred on December 16, 1984 while a customer in the K Mart store in Lockhaven, Pennsylvania. Plaintiff was part of a large crowd waiting to purchase Cabbage Patch dolls. Plaintiff was knocked to the ground by the other customers when the crowd rushed to obtain the product for which they had been waiting for some period of time. A jury trial was held in this matter and concluded on January 13, 1988 when the jury returned a verdict finding the defendant 60% negligent and the plaintiff 40% negligent. Damages were awarded in the sum of $167,000 and judgment was entered thereon for the sum of $100,200, after deducting the plaintiff's contributory negligence.

Plaintiff has filed a motion for a new trial and a separate motion for delay damages. Defendant has filed a motion notwithstanding the verdict or, in the alternative, for a new trial.

*Plaintiff's Motion for a New Trial*

Plaintiff's first assignment of error is the court's refusal to permit the testimony of plaintiff's expert in retail marketing, Professor Fred Hurvitz. By order of September 15, 1986 this court entered a case management order in which it instructed that discovery would be completed by March 6, 1987. On November 25, 1987 counsel for plaintiff filed a pretrial memorandum. In that memorandum, for the first time, plaintiff identified Fred Hurvitz as a potential witness. In the pretrial memorandum counsel further instructed that Hurvitz will testify "that permitting the crowd to gather and falling [sic] to dispurse them was improper, the attempted method of distribution was improper, he will state that the employees were not properly trained, he will discuss all areas of negligence in the complaint." The court granted defendant's motion in limine to preclude this testimony. A pretrial conference was held on December 8, 1987 and the trial commenced in January, 1988.

Plaintiff's identification of Fred Hurvitz was not timely filed, and in violation of the court's order with regard to discovery. In any event, it was and is the conclusion of the court that testimony proffered on behalf of Professor Hurvitz was not the type of testimony contemplated by Federal Rule of Evidence 702.

Federal courts may admit expert testimony on subjects within the knowledge of the average juror. The ultimate standard is whether the expert brings a helpful quality to the litigation which otherwise would be lacking. In *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1313, (E.D.Pa.1980), *modified* on other grounds, 723 F.2d 238 (3d Cir.1983) stated, "[a]s defined by the Advisory Committee, the helpfulness inquiry is ' "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." ' " *Id.* at 1330 citing Fed.R.Civ.P. 702 advisory committee's notes quoting Ladd, *Expert Testimony*, 5 Vand.L.Rev. 414, 418 (1952). The standard to be applied is a relative one which depends upon the particular subject or the particular witness. With this in mind, this court will examine the proffered testimony of Mr. Hurvitz.

Professor Hurvitz was to testify that permitting the crowd to gather and failing to disburse them was improper. Not only is this testimony on the ultimate issue of negligence, but this was certainly an area that the lay jury could itself make a determination from the testimony that was presented at trial. The same holds true with the proffer that the method of distribution of the dolls was improper. The proffer as to the proper training of the employees may have been permissible but was not necessary as all the employees

who were called to testify testified to the extent of their training and the jury could form their own conclusion without the aid of Mr. Hurvitz.

■ The last broad area of Mr. Hurvitz' testimony was "all areas of negligence in the complaint." Once again, not only does this appear to be testimony on the ultimate issue to be decided, it is also very vague as to what areas are included. The court recognizes that Rule 702 of the Federal Rules of Evidence does permit opinion on the ultimate issue. In determining whether the ultimate issue opinion can be received under Rule 702, the court must determine whether the subject matter of the testimony presented is helpful to the jury. In other words, the expert's specialized body of knowledge must assist the trier of fact in determining a fact in issue or aid in understanding the evidence. It is the inability of the unaided jury to reach the ultimate opinion that renders the expert's opinion valuable. The subject matter of Mr. Hurvitz' testimony was clearly within the knowledge, experience and understanding of the jury, and as such his testimony would have added nothing to assist the jury. It is of importance to note that Mr. Hurvitz was not a safety expert nor an expert on crowd control. The proffered expert testimony of Mr. Hurvitz had no real probative value when judged by the criteria of the helpfulness to the jury as expressed in Federal Rule of Evidence 702.

■ Plaintiff assigns as error the court's refusal to permit the testimony of one Alvin Geyer and one Richard Shortledge, former Piper employees, on the issue of damages. The testimony of these two witnesses was alleged to be relevant to proving lost earning capacity of June Rossman. In the spring of 1984, Piper began a series of layoffs which included Rossman, Geyer and Shortledge. The plant in Lockhaven ultimately closed. In June of 1985, Rockwell International came to the Lockhaven employment office to interview persons for aircraft jobs in Ohio. Geyer and Shortledge applied and were ultimately hired by Rockwell International. June Rossman allegedly attempted to apply for a job but

was denied an application allegedly due to the cast on her arm. The cast resulted from the operation she had undergone due to injuries received in the underlying accident. It is plaintiff's argument that she was a qualified riveter, was of similar age and similar training and background as Mr. Geyer, and could have earned the same funds as Mr. Geyer and Mr. Shortledge by working at Rockwell International.

As stated previously, the available work for Rockwell International was in Ohio. Since the Columbus, Ohio job, Geyer has also been hired by other airplane manufacturers in Missouri (McDonnell Douglas), and California (Northrup Aviation). Other jobs which he considered but did not take were Grumman Aircraft in New York and Boeing in Washington.

Mr. Shortledge's testimony was proffered to show the wages in the industry and what June Rossman could have earned in the industry. His testimony was also proffered to attest to the skills of the plaintiff. It is clear from the testimony of Geyer that working in the airplane industry is itinerant work. Whether the plaintiff in this case would have traveled throughout the United States to maintain her employment in the aviation industry is sheer speculation. It is also sheer speculation as to whether or not she would have been hired by Rockwell International in Columbus, Ohio, even absent the injury to her arm. While mathematical exactness is not required of a jury's damages computation, purely speculative damages cannot be recovered. The evidence must establish a reasonably fair basis upon which the jury can calculate the plaintiff's loss. *American Air Filter Co., Inc. v. McNichol*, 527 F.2d 1297 (3d Cir.1975).

Plaintiff was a life-long resident in the Lockhaven, Pennsylvania area. Her children and grandchildren reside in the same general area. There is nothing in the record to indicate that Mrs. Rossman would have left the Lockhaven area to pursue employment in other states. Furthermore, the difference between the experience of Geyer and Shortledge and that of Rossman was considerable. Mrs. Rossman had

spent only three or four months doing the work that Geyer and Shortledge had been doing for substantial portions of their professional lives. Therefore, it was sheer conjecture that she would have been hired by any of the airplane companies who came into the Lockhaven area in June of 1985 seeking applicants for employment. There is no foundation to support the conclusion that plaintiff's impaired earning capacity should be equated on the basis of the potential earnings of Geyer and Shortledge.

The next item of alleged error is the grant of summary judgment to the defendant on the issue of punitive damages. The basis for this alleged error is plaintiff's allegation that, in the face of a large, anxious and unruly crowd, employees of defendant pushed a cart of Koosa dolls out of the stockroom and into the midst of the crowd. This, plaintiff alleges, caused the crowd to stampede. Plaintiff further alleges the situation was then aggravated when two employees began throwing boxes of dolls in the air which added to the excitement and confusion. Janet Kinley testified that she observed one of the people who pushed the cart out of the stockroom throw some boxes in the air. The individual was described as tall, dark haired with a mustache, and a dirty white t-shirt. (NT at 146.) Betty Basinger testified that she also saw boxes flying in the air and that she imagined that it was an employee who was throwing the same because it was an individual who was pushing the cart. Mrs. Rossman testified that she saw boxes flying in the air near people standing by the cart. She also testified that when the crowd found out that they were Koosa dolls instead of Cabbage Patch dolls, the customers themselves began throwing boxes of dolls at the crowd.

Gerald Shady and Bruce Musheno, two employees responsible for wheeling the cart of Koosa dolls from the storeroom to the crowd, both testified that neither of them threw any boxes in the air, but instead, upon seeing the crowd rush toward them, immediately ran in different directions to avoid the rush. They in turn saw the crowd throwing boxes into the air. Further, Mr. Musheno testified that all employees were required to wear, and were wearing on the day in question, dress slacks, dress shirts, and ties. Thus, the inference may be drawn that the individual described by Janet Kinley was not an employee of defendant.

■ Under Pennsylvania law, to receive punitive damages for a tort it is required that the plaintiff establish that tortious conduct was outrageous. *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495 (3d Cir.1978), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). Outrageous conduct is defined as an act done with a bad motive or with reckless indifference to another's interest. *Kann v. Keystone Resources, Inc.*, 575 F.Supp. 1084 (W.D.Pa.1983). Under Pennsylvania law a punitive award may be made against a corporation for an employee's tort. The conduct of the agent who inflicts the injury complained of must be clearly outrageous to justify vicarious imposition of exemplary damages upon the principle. *Skeels v. Universal C.I.T. Credit Corp.*, 335 F.2d 846 (3d Cir.1964). In making a determination on whether to submit the issue of punitive damages to the factfinder, the court must consider the nature of the act, the motive of the wrongdoer, the relationship of the parties, and the surrounding circumstances. *Dean Witter Reynolds, Inc. v. Genteel*, 346 Pa.Super. 336, 499 A.2d 637 (1985), *appeal denied*, 514 Pa. 639, 523 A.2d 346 (1987).

■ The evidence in the case shows that K Mart did not advertise the sale of the Cabbage Patch dolls; word of the existence of the dolls was spread by rumor throughout the store by persons unknown. Efforts made to talk to the gathering crowd were of no avail, and the decision to push a cart of Koosa dolls out from the storeroom was done with the intent to appease the crowd, rather than with an evil intent or wanton indifference or bad motive. There was no basis to permit a claim for punitive damages to be presented to a jury.

■ The plaintiff also requests a new trial on the basis that the damages were inadequate. In *Deitrick v. Karnes*, 329

Pa.Super. 372, 478 A.2d 835 (1984), the court held that verdicts, though seemingly low and unfair, are nevertheless adequate where jurors reach an impasse over conflicting testimony on liability, contributory negligence or degree of injury. In this case there was conflicting medical testimony as to whether the plaintiff's complaints were a result of the trauma which occurred to her in December of 1984, or whether her complaints were more consistent with diabetic neuropathy associated with the plaintiff's underlying diabetes. This factor may have affected the award for pain and suffering, as well as the award for impaired earning capacity. In addition, plaintiff's historical wages have been low. This, too, may have affected the weight which the jury gave to Professor Corcioni who testified in that regard. Under the circumstances the award is not inadequate.

*Defendant's Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial*

■ Defendant argues, under the evidence submitted during the trial of the case, it was entitled to a directed verdict based upon the assumption of risk defense or, in the alternative, that the court erred in refusing to charge the jury on the issue of plaintiff's assumption of risk. It is defendant's basic contention that once Rossman became part of the crowd at the K Mart store, she assumed the risk of anything that would happen with regard to the association with that crowd.

Mrs. Rossman was a business invitee to whom K Mart owed a duty to use reasonable care in the conduct of its business. K Mart had the duty to take reasonable steps to discover if third persons were likely to perform any accidental, negligent or intentionally harmful acts and to take reasonable care to provide appropriate precautions to protect its business invitees from harm. *Carswell v. Southeastern Pa. Trans. Auth.*, 259 Pa.Super. 167, 393 A.2d 770 (1978). While Mrs. Rossman became part of a crowd that ultimately became testy and unruly, there is no evidence that she subjectively knew that K Mart Corporation would fail to take proper precautions

to control the crowd, or to provide a reasonably safe method for distribution of the dolls. Nor could Mrs. Rossman have anticipated that K Mart employees would take actions that would cause the unruly crowd to stampede. In *Smith v. Seven Springs Farm, Inc.*, 716 F.2d 1002 (3d Cir.1983) the court held:

> If by reason of age, or lack of information, experience, intelligence, or judgment, plaintiff did not understand the risk involved in a known situation, he will not be taken to have assumed the risk.... Likewise, if plaintiff's words or conduct make it clear that he did not willingly accept the risk, the absence of voluntariness will preclude a finding of assumption of risk.... Finally, defendant must show that plaintiff's conduct in knowingly and voluntarily confronting the risk was reasonable.... Although the existence of knowledge, voluntariness, and reasonableness are usually questions of fact for the jury, ... where reasonable persons could not differ as to the conclusion, the issue may be decided by the court.

*Id.* at 1009 (citations omitted).

Mrs. Rossman testified on direct examination as follows:

Q What was the crowd doing while they were waiting for the dolls?

A Talking.

Q Was the crowd unruly?

A I didn't see anyone do anything that I thought would have been unruly. They were loud, they were talking, but I didn't see anybody hit anybody or push anybody or anything during this time. No.

Q Did you at any time feel that you were in danger while standing in that crowd?

A No.

Q Did you feel anything might happen?

A No.

N.T. Vol. I at 181. On cross-examination Mrs. Rossman testified as follows:

Q Isn't it also true, Mrs. Rossman, that this crowd became very unruly while they were waiting for these dolls?

A No, that is not true.

Q Not at all true?

A it is not true. They did not become unruly at that point. No.

Q Isn't it true that customers were shouting obscenities and threatening the employees at that time?

A I can't say what happened to the left of me, but the people that were in my vicinity, they were loud, they were talking. I honestly did not hear anybody saying obscenities. I am not saying it didn't happen. It didn't happen where I was.

Q Isn't it true that you yourself were shouting obscenities.

A That is not true.

Q Mrs. Rossman, I'm going to show you what has been marked as Defendant Exhibit 1 which is the complaint that you filed in this case against K Mart. I want you to read to the jury, if you would, paragraph number 8.

A As a direct consequence of these statements a large crowd of customers gathered in the rear of the store in front of a set of doors leading to the shipping department. The crowd continued to grow in size and number and became increasingly unruly.

Q You are saying in your complaint, Mrs. Rossman, that the crowd grew increasingly unruly, isn't that correct?

A In that complaint it does not specifically tell you when the crowd became unruly, at what point.

Q You say that a large crowd of customers gathered in the rear of the store in front of a set of doors leading to the shipping department; the crowd continued to grow in size and number and became increasingly unruly.

A At what point I did not specify.

Q I'm asking you what do you mean by that?

A The crowd did become unruly when the boxes were thrown in the air. That was the only time the crowd became unruly in the area that I was standing. I can't testify what people did somewhere else.

Q Mrs. Rossman, the crowd that you observed, the 250 or 300 people you observed, wouldn't you agree that situation and in that confined area created a dangerous situation?

A I was there for a doll. I didn't think about it.

Q Wouldn't you agree that was a dangerous situation?

A It didn't appear to be or I wouldn't have stood there.

Q I'm going to show you your deposition, Mrs. Rossman, beginning at line 19, page 52. Question: I asked you, Mrs. Rossman, did the crowd that you observed, was it such that to create a hazardous and dangerous condition in your mind, what was your response?

A I said yes it was.

Q I asked you why, what was your response?

A I said that if there would have been a fire people could have not have never gotten out. They would have been stampeding each other.[1] There were many people in a small area. It was packed.

Q You agree this area was packed.

A It was packed, yes sir.

(N.T. Vol. II at 239–242). Under the circumstances, due to poor judgment and lack of understanding of the risk involved, it cannot be said that Mrs. Rossman fully understood the specific risk of the harm created by K Mart's conduct and that she voluntarily chose to encounter it. Plaintiff's conduct was at most negligent, and it was appropriately submitted to the jury as comparative negligence.

---

1. In her deposition, Mrs. Rossman stated that she came to this conclusion post-accident.

(Deposition of June Rossman at page 52, line 19 to page 53, line 18.)

*Plaintiff's Request for Delay Damages Under Rule 238 of Pennsylvania Rules of Civil Procedure*

 Plaintiff filed her motion for delay damages on January 22, 1988. On January 13, 1988 a jury verdict was rendered in the captioned matter, and on January 14, 1988 this court entered judgment in accordance with the jury verdict.

In *Craig v. Magee Mem. Rehab. Center*, 512 Pa. 60, 515 A.2d 1350 (1986), the Supreme Court of Pennsylvania stated "we direct that claims for delay damages are to be presented by petition within five days of a jury verdict or arbitration award." *Id.* at 65, 515 A.2d at 1353. Pursuant to *Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937), a federal court exercising jurisdiction in a diversity case must apply the state law as declared by the highest state court. In counting the days available to the plaintiff, the court will apply Rule 6 of the Federal Rules of Civil Procedure which provides that "when the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation."

Plaintiff's motion was due on January 21, 1988. It was filed January 22, 1988. Defendant is correct in noting the petition is not timely filed. The plaintiff's request for delay damages will be denied.