In re Christopher James CLEMENS, t/d/b/a The Clemens Organization & Christopher J. Clemens, Architect, Debtor.

Christopher James CLEMENS, t/d/b/a The Clemens Organization & Christopher J. Clemens, Architect, Plaintiff,

v.

WEST MILTON STATE BANK, Defendant.

Bankruptcy No. 5–92–01361.
Adv. No. 5–93–0028.

United States Bankruptcy Court, M.D. Pennsylvania.

April 29, 1996.

As Corrected June 10, 1996.

David Braverman, Philadelphia, PA, for Debtor/Plaintiff.

Laurence Dague, Harrisburg, PA, for Defendant.

### OPINION AND ORDER

JOHN J. THOMAS, Bankruptcy Judge.

The decision in this lender liability case by the Debtor, Christopher James Clemens, t/d/b/a The Clemens Organization, against the West Milton State Bank is based upon the following factual history, which we specifically make findings of fact.

In 1985, the Debtor, Christopher James Clemens, ("Plaintiff") and Norman Harris, acting as partners, acquired title to an eleven (11) acre parcel of land in Kelly Township, Union County, Pennsylvania, for the purpose of developing a medical office. That purchase was financed by a One Hundred Eighty–Seven Thousand Dollar ($187,000.00) loan from West Milton State Bank ("Bank").

The following year, the Clemens–Harris partnership acquired an additional 17.95 acres of land for the purpose of constructing up to forty-eight (48) condominium townhouse units, which they identified as "Millward Estates". In completing that purchase and in order to build and sell the first phase of the project, the Bank loaned an additional Seven Hundred Fifty Thousand Dollars ($750,000.00) to the Clemens–Harris partnership.

Although seven of the first eight units at Millward Estates were constructed and promptly sold, the project costs exceeded budget and the partnership approached the Bank for further funding. The Bank agreed and, on August 17, 1987, increased the Seven Hundred Fifty Thousand Dollar ($750,000.00) mortgage to One Million One Hundred One Thousand Dollars ($1,101,000.00) (hereinafter identified as a line of credit).

The loan was made on an interest-only basis with the principal to be fully paid back or refinanced on or before August 17, 1990.

In the fall of 1987, Norman Harris indicated a desire to leave the partnership. This was accomplished in March of 1988 when the Plaintiff, utilizing Two Hundred Thousand

Dollars ($200,000.00) from the existing line of credit, purchased Harris' interest.

The Plaintiff had hoped that this buyout would be funded by an increase in the line of credit to the Plaintiff from the current One Million One Hundred One Thousand Dollars ($1,101,000.00) level to One Million Three Hundred One Thousand Dollars ($1,301,000.00). While the money was loaned to the Plaintiff, no increase in the line of credit was forthcoming. Rather, it was apparently generated by the existing line of credit. Moreover, a separate loan of Two Hundred Thousand Dollars ($200,000.00) was not funded despite the execution of specific loan documentation. *Defendant's Exhibit AI.* The net effect of this action by the Bank was to reduce, by Two Hundred Thousand Dollars ($200,000.00), the funds available to fund the Millward Estates project while simultaneously requiring additional unencumbered real estate to stand as collateral for the line of credit.

This left the Plaintiff in a situation as of November of 1988 where only twenty (20) of his forty-eight (48) Millward Estates units were completed, yet the line of credit utilized for funding the project was effectively reduced to Nine Hundred One Thousand Dollars ($901,000.00) with nominal funds available for further construction. *Transcript dated November 8, 1993 at pp. 103–106. Dingler Deposition dated August 3, 1993 at p. 38.*

The Plaintiff's problems, at this point, were also related to his failure to sell the fully-constructed units to the public—a problem most likely attributable to the economic slowdown experienced in this area of the country during that time period.

In January of 1989, the Plaintiff requested an additional Eight Hundred Thousand Dollar ($800,000.00) loan from the Bank. Despite not having received this loan, construction began on an additional eight units in the spring of 1989.

Having failed to receive a timely payment on the loan and obviously becoming skittish about its prospects for being repaid, the Bank declared a default on June 9, 1989, payments having been twenty-three (23) days past due at that point.

The Plaintiff argues that the Bank's declaration of default was premature and violated the loan documents in that the Bank had agreed in writing to provide the Plaintiff with a sixty (60) day grace period for any past due payments.

The following month, in July of 1989, the Bank made demands on its guarantors who are identified as Mr. and Mrs. Harold N. Clemens, Plaintiff's parents, and Mr. David P. Clemens, Plaintiff's brother.

It was in this climate that negotiations took place between the Plaintiff and the Bank in attempting to restructure the line of credit and other related obligations. These negotiations culminated on September 7, 1990 with the entry of a Modified Loan Agreement ("MLA") between the parties, which had the effect of reducing the line of credit from One Million One Hundred One Thousand Dollars ($1,101,000.00) to Six Hundred Eighty–Eight Thousand Dollars ($688,000.00) to be accomplished by selling off some of the collateral that had been pledged and paying those proceeds to the Bank. On September 13, 1991, unit 404 of Millward Estates was sold and the proceeds paid to the Bank. The Bank misapplied a portion of those proceeds causing the credit limit extended to the Plaintiff to be exceeded. On September 19, 1991, the Bank, through counsel, notified the Plaintiff that it intended to execute and gave the Plaintiff thirty (30) days to bring the loans current. *Plaintiff's Exhibit No. 52. Defendant's Exhibit "T".* This grace period was inconsistent with the ninety (90) day cure period provided in the MLA. *Transcript dated April 21, 1994 at p. 153.*

## DISCUSSION

The Plaintiff suggests that the Bank is liable to him on numerous theories of lender liability. He raises those theories in the ten counts of this litigation which are identified as follows:

Count I—Equitable Subordination;

Count II—Breach of Contract;

Count III—Negligent Misrepresentation;

Count IV—Fraud;

Count V—Tortious Interference with Contract;

Count VI—Interference with Prospective Economic Advantage;

Count VII—Intentional Infliction of Emotional Distress;

Count VIII—Abuse of Process (Wrongful Foreclosure);

Count IX—Breach of the Covenant of Good Faith and Fair Dealings;

and,

Count X—Breach of the Statutory Duty of Good Faith

At the time of trial, Count VII (intentional infliction of emotional distress) was withdrawn. Furthermore, the parties agreed to bifurcate the trial so that liability only would be at issue and trial on damages, if necessary, would be scheduled only after this decision.

Notwithstanding the various theories of recovery espoused by the Plaintiff, there are two basic failures that the Plaintiff alleges should result in recovery to him. The Plaintiff asserts that (1) the Bank wrongfully declared a default; and (2) the Bank wrongfully failed to fund the Millward Estates' project.

### A. THE MODIFIED LOAN AGREEMENT (Substituted Contract or Accord)

A preliminary issue as to the impact of the Modified Loan Agreement of September 7, 1990 must be addressed early in this opinion. The Bank contends that this Modified Loan Agreement ("MLA") is a "substituted contract".

The Plaintiff, on the other hand, suggests that the Modified Loan Agreement was no more than a modification of the contract or, at best, an accord that has been breached. The distinction between the two positions, i.e. whether the loan modification agreement is a substituted contract or an accord and satisfaction, is very significant.

A substituted contract "is a mode of extinguishing one obligation by another, that is, the acceptance of a new promise in satisfaction of a previously existing claim while in the case of an accord and satisfaction it is not the new promise itself but the performance of the new promise that is accepted as a satisfaction". *Nowicki Construction Co., Inc. v. Panar Corp. N.V.,* 342 Pa.Super. 8, 15, 492 A.2d 36, 40 (1985) citing *Gordon Brothers, Inc. v. Kelley,* 92 Pa.Super. 485 at 491 (1927).

If the Modified Loan Agreement is considered a "substituted contract" then any breaches that existed prior to September 7, 1990 would no longer support this litigation. On the other hand, if the September 7, 1990 modification agreement is no more than an accord and satisfaction, then those duties under the original contract between the parties are merely suspended until full performance of the accord. If there is a breach of the accord, then the obligee may enforce either the original duty or any duty under the accord. *Restatement (Second) of Contracts,* § 281(2).

The burden of proving the existence of a substituted contract is on the party making the assertion. *Nowicki Construction Co., Inc. v. Panar Corp. N.V.,* 342 Pa.Super. 8, 15, 492 A.2d 36, 40 (1985).

In analyzing this very difficult question, we find it helpful to turn to Professor Corbin's treatise.

"It happens very frequently that a party to a valid contract attempts, either as plaintiff or as defendant, to show that a new contract has been substituted, either as a total discharge or as a partial modification and discharge. The existence of such a new contract of substitution or modification must be established in the same way as is any other contract. No one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract. . . .

"It is frequently difficult to determine whether a new agreement is a substituted contract operating as an immediate discharge, or is an accord executory the performance of which it is agreed shall operate as a future discharge. It is wholly a question of intention, to be determined by

the usual processes of interpretation, implication, and construction." *6 Corbin on Contracts,* § 1293 at pp. 188–190.

The language of the Modified Loan Agreement is helpful for what the MLA says as well as those items it fails to address. On pages 3 and 4 of the Modified Loan Agreement ("MLA"), the Bank has agreed to make advances in an amount not to exceed the sum of Six Hundred Eighty–Eight Thousand Dollars ($688,000.00) and to pay these funds pursuant to an earlier loan agreement dated August 17, 1987, ". . . all documents hereby incorporated into this 'Agreement' by reference."

Moreover, the agreement on page 2 specifically alludes to a dispute as to whether an "event of default occurred".

Finally, on page 11 of the MLA, an indication of ". . . pending or threatened actions or proceedings . . ." were to be identified in a letter delivered by the borrower (Clemens) to the Bank.

These comments were inserted in the MLA without any attempt to utilize typically familiar language suggesting that a release or waiver has occurred.

"It is a question of interpretation how far the new agreement operates as a discharge and how many antecedent claims are included and discharged. The new contract may adopt and include a part of the antecedent one. If there are claims for monies due under the previous contract or for damages for breaches committed, these will be discharged by the substitution of the new executory agreement if such an intention is sufficiently expressed. . . .

"A difficult question of interpretation may arise when a second contract deals with the same subject matter as did the first contract made by the same parties, but does not state whether or to what extent it is intended to operate in discharge or substitution. The two contracts must be interpreted together. In so far as they are inconsistent, the later one prevails; the remainder of the first contract, being quite consistent with the second in substance and in purpose may be en-

forced." *6 Corbin on Contracts,* § 1293 at pp. 197–198.

■ The issue as to how we interpret a given agreement depends upon the effect intended by the parties. *Hydro–Flex, Inc. v. Alter Bolt Company, Inc.,* 223 Pa.Super. 228, 232, 296 A.2d 874, 877 (1972). Moreover, "[t]he law in Pennsylvania on releases is well established. Instruments, whereby a party surrenders rights to which he might otherwise be entitled, are strictly construed." *In re Vacuum Cleaner Corporation of America,* 40 B.R. 515, 516 (Bankr.E.D.Pa.1984).

Since we can find no intention by the parties to discharge the earlier agreement, we find that the MLA was but a mere modification of the original loan documentation between the parties and, therefore, cannot serve as a de facto release of causes of action occurring prior to September 7, 1990.

### B. BREACH OF CONTRACT

■ Having addressed the impact of the MLA, we next turn our attention to the loan documents between the parties and the question as to whether those loan documents were breached by the Bank.

Count II of the complaint alleges that the Bank breached its contract with the Plaintiff by failing to fund the project in accordance with both the original agreement as well as the loan modification agreement.

The Plaintiff further alleges that the Bank wrongfully declared a breach of the August, 1987 loan documents and also of the 1990 MLA.

### 1. Failure to Fund

The original loan documents as set forth in Plaintiff's Exhibit No. 30, commit the Bank to fund One Million One Hundred One Thousand Dollars ($1,101,000.00) in support of the project.

In 1988, when the Plaintiff decided to buyout his partner, Norman Harris, he sought further funding from the Bank. The Bank agreed to provide that funding by letter dated February 3, 1988 and identified as Plaintiff's Exhibit No. 33. In short, the Bank ". . . approved accommodations in the additional amount of Two Hundred Thousand

Dollars ($200,000.00) to purchase the interest of your partnership". In addition, Ralph Cox, the then president of the Bank, indicated a need for additional collateral against the "Rea & Derick Store in Milton", a property owned by the Plaintiff and his brother, David.

The Plaintiff was obviously concerned about tieing up property owned by himself and his brother, who apparently had no interest in the Millward Estate project. On March 3, 1988, the Plaintiff sent a letter to Mr. Cox voicing certain concerns to the Bank. *Plaintiff's Exhibit No. 34.* Because an analysis of that correspondence is important to our decision, we attach it to the Appendix.

The second paragraph of that letter includes the following sentence.

When your bank makes the financial accommodations to me to purchase my partner's interest in the amount of $200,-000.000 (sic), the total obligation would have a face amount of $1,301,000.00.

It is upon this sentence that the Plaintiff builds his argument that the Bank committed itself to a line of credit of One Million Three Hundred One Thousand Dollars ($1,301,-000.00).

While we agree with the Plaintiff, that a commitment letter can, in fact, be considered a binding contract[1], the thrust of the correspondence of February 3, 1988 and March 3, 1988 discusses less the extent of the line of credit than the terms of release of the Plaintiff's brother, David's, interest in the Rea & Derick property.

We conclude that the Bank agreed to loan to the Plaintiff the sum of Two Hundred Thousand Dollars ($200,000.00) to purchase the interest of Norman Harris in the partnership. We, nevertheless, disagree with the Plaintiff that the line of credit increased. In other words, the line of credit remained at One Million One Hundred One Thousand Dollars ($1,101,000.00) despite a commitment to extend an additional Two Hundred Thousand Dollar ($200,000.00) loan evidenced by the note of March 3, 1988. *Defendant's Exhibit AI.*

In focusing on the correspondence of March 3, 1988 from the Plaintiff to the Bank's president, Ralph Cox, it is important to note that the only ostensible reason that the Plaintiff wrote the correspondence was to confirm the terms of release of that Milton property owned, in part, by his brother. That letter contains the following language.

"My brother has no interest in The Clemens–Harris Partnership or my purchase thereof, and he is concerned about the *release* of the mortgage when certain conditions have been met.... At that time, it is my understanding that the collateral mortgage on the property owned by my brother and I in Milton will be *released.* ... It is my understanding that at that time, and as stated above, that the collateral mortgage on the Milton property will be *released.*

"Please confirm my understanding of the *release* arrangement by placing your signature in the space provided below." [Emphasis ours.] *Plaintiff's Exhibit No. 34.*

In addition, before the "space provided below" was typed in the same type as the body of the letter, the following: "The terms and conditions of this *release* will be met by the bank provided, of course, all accounts at that time by Mr. Clemens are current." [Emphasis ours.]

In different type, below that, were placed the words, "The West Milton State Bank hereby approves the *release* arrangements set forth above." [Emphasis ours.] Below that appeared the signature of Ralph Cox.

When every paragraph of this letter centers around the conditions of the release of the Milton Street property, can there be any doubt that the extent of the line of credit was of insignificant concern to the parties? In fact, this court interprets the phrase in which the number One Million Three Hundred One Thousand Dollars ($1,301,000.00) is used as observing nothing more than the possibility that the total potential exposure of the Plaintiff to the Bank would be in the face amount of One Million Three Hundred One Thousand Dollars ($1,301,000.00).

**1.** *Sterling Faucet Company v. First Municipal*   *Leasing Corporation,* 716 F.2d 543 (8th Cir.1983).

A new Two Hundred Thousand Dollar ($200,000.00) note was executed without apparent objection on behalf of the Plaintiff and, more importantly, without an alteration of the original loan documents. See *Defendant's Exhibit "AI"*. Despite that, the Two Hundred Thousand Dollar ($200,000.00) loan was never actually implemented as a separate loan facility but stood unused until it was marked satisfied on September 16, 1988. *Transcript dated November 9, 1993 at p. 191.* As indicated earlier, by advancing the Two Hundred Thousand Dollar ($200,000.00) buyout from the line of credit, the Bank effectively and unjustifiably reduced the funding available for the construction of Millward Estates.

### 2. Default of 1987 Loan

During the course of the trial and in posttrial pleadings, the Plaintiff alleges that the Bank, on June 9, 1989, sent letters to the Plaintiff and to the guarantors advising them that the loan was in default. The Plaintiff argues that this declaration was erroneous and, in fact, was a breach of the contract between the parties.

The Two Hundred Thousand Dollar ($200,000.00) loan from West Milton State Bank to the Plaintiff was evidenced by a promissory note dated March 3, 1988, payable at the rate of One Thousand Seven Hundred Fifty Dollars ($1,750.00) per month with a balloon payment due September 1, 1988. *Defendant's Exhibit "AI"*. As collateral security for that note, the Plaintiff and his brother, David P. Clemens, gave to West Milton State Bank and its co-participant, First National Trust Bank, a mortgage in the sum of Two Hundred Eighteen Thousand Dollars ($218,-000.00). Not only was this mortgage collateral security for the aforesaid note of March 3, 1988, but it further indicated that it was additional security for the One Million One Hundred One Thousand Dollar ($1,101,-000.00) indebtedness of August 17, 1987.

The note of March 3, 1988 was marked "paid" on September 16, 1988. Since the note of March 3, 1988 was marked "paid", the only remaining obligation upon which the mortgage of March 3, 1988 was given was the original line of credit of One Million One Hundred One Thousand Dollars ($1,101,-000.00) evidenced by note and mortgage dated August 17, 1987. The court finds that it was the alleged delinquency in the August 17, 1987 debt that caused the Bank to demand "... payment in full of the sum of $218,000.00 ..." in the Bank's correspondence of June 9, 1989 directed to the Plaintiff and his brother, David P. Clemens. *Plaintiff's Exhibit No. 41.* We further find that it was that delinquency which caused the Bank to issue a letter dated June 9, 1989 directed to the Plaintiff's parents, Mr. and Mrs. Harold N. Clemens, "... demanding payment in full of the sum of $220,000.00, being the amount guaranteed by you". *Plaintiff's Exhibit No. 40.*

■ Whether or not the June 9, 1989 correspondence from the West Milton State Bank to Mr. and Mrs. Harold N. Clemens and to the Plaintiff and David P. Clemens were justified pursuant to the contract, depends upon an interpretation of the loan documents of August 17, 1987. Those loan documents include a mortgage, a mortgage note, and an advance money mortgage contract. *Plaintiff's Exhibit No. 30.*

The default provision of the mortgage reads as follows:

ACCELERATION OF MATURITY AND FORECLOSURE PROCEEDINGS UPON DEFAULT. In case default be made by the Mortgagor in the payment of any installment of principal, interest, or other sums payable under the terms of this Mortgage or the accompanying Note, and the total arrearages are equivalent to two contracted monthly installment payments, or in the event of a breach by the Mortgagor of any of the other obligations, covenants, conditions and agreements set forth in this Mortgage, in the accompanying Note, or in the Advance Money Mortgage Contract between Mortgagor and Mortgagee of even date herewith, then and in such case the entire unpaid balance of the indebtedness, including advances and all other sums paid by the Mortgagee in accordance with the terms of this Mortgage or the accompanying Note, together with unpaid interest thereon, shall, at the option of the Mortgagee, and without notice, be-

come immediately due and payable, and foreclosure proceedings may be brought forthwith on the Mortgage and prosecuted to judgment, execution and sale for the collection of the same, together with costs of suit and an attorney's commission of five per centum of the total indebtedness or five hundred dollars, whichever is the larger amount.

Pursuant to the mortgage, the total sum of One Million One Hundred One Thousand Dollars ($1,101,000.00) was ". . . [p]ayable as to interest on the outstanding balance of principal only during the first thirty-six (36) months from the date hereof with interest payable monthly on the outstanding balance of principal, . . .".

The mortgage note provisions read in similar fashion to that of the mortgage and the advance money mortgage contract incorporated the conditions of the note and mortgage.

Presumably, if interest is payable monthly, then "total arrearages are equivalent to two contracted monthly installment payments" when the monthly interest payment is missed and when the next successive interest payment is also missed, all of which would occur over a period of one month plus one day. While all of that may be understandable enough in the 20/20 vision we call hindsight, it apparently did not comport with the then understandings of the parties.

Current Bank president, Ralph Dingler, said in his deposition that it was his understanding that the Plaintiff had sixty (60) days grace period before a default was declared. *Plaintiff's Exhibit No. 7 at p. 24.* Senior Bank loan officer and vice president, Dennis Keefer, added in his trial testimony that he agreed the Plaintiff had sixty (60) days grace period before a default could be declared. *Transcript dated April 22, 1994 at p. 113.* The Plaintiff testified with great specificity that the grace period was a negotiated term arrived at when the Bank wanted a typical thirty (30) day grace period and the Plaintiff requested a ninety (90) day grace period. He said that the sixty (60) day grace period was a result of a compromise between these positions. *Transcript dated April 1, 1994 at p. 154.*

The Modified Loan Agreement dated September 7, 1990, specifically refers to the Bank's willingness to "extend the borrower's clearance of default from sixty days to ninety days". *Plaintiff's Exhibit No. 45, Modified Loan Agreement, p. 4.*

These facts lead the court to believe that a mutual mistake of both parties existed as to the effect of the written loan agreements of August 17, 1987. The court finds that both parties to the contract understood the grace period to be sixty (60) days despite the written provisions for a lesser time period.

§ 155. **When Mistake of Both Parties as to Written Expression Justifies Reformation**

Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected. *Restatement (Second) of Contracts,* § 155.

While the court acknowledges that there has not been a motion by either side to reform the substance of these agreements, the Plaintiff's position, both at trial and in supporting brief, has been uniformly that there was a sixty (60) day grace period regarding the August 17, 1987 loan. We will consider that the equivalent of an oral motion to effect a reformation and grant that motion since we cannot conclude that the rights of third parties will be unfairly affected by such reformation and since this reformation would effectuate the understanding of all parties to the loan.

Notwithstanding this conclusion, we find that the loan payment was due for May 17, 1989 and, thereafter, was no greater than twenty-three (23) days late. It could not have justified the declaration of default implied in the letters of June 9, 1989. *Transcript dated November 9, 1993 at p. 132.*

While we have discounted the failure to make monthly payments as being reasonable

grounds for issuing the default letters of June 9, 1989, we have not excluded other reasons that may have accounted for those items of correspondence.

Nevertheless, a review of the deposition of Lewis D. Dingler, dated August 3, 1993 and identified as Plaintiff's Exhibit No. 7, indicates that there was little reason other than the past due payment that caused the execution of the letters. Lewis Dingler, at the time the letter was written, was senior vice president of the Bank, having recently taken over the supervision of the Plaintiff's loan from the Bank president, Ralph Cox. The deposition of Mr. Dingler as well as the deposition Exhibit No. 12 verifies that the default letter of June 9, 1989 was based on the payment delinquency and the scrutinization that was being made by regulatory agencies because the Plaintiff was the son of a director of the Bank.

Mr. Dingler testified at trial that his first official act in connection with his responsibilities on the Plaintiff's loan was to issue the June 9, 1989 default letters. *Transcript dated April 21, 1994 at p. 105.* He acknowledged that he sent the letters without reading the loan documentation. *Transcript dated April 21, 1994 at p. 108.* In his deposition, Mr. Dingler acknowledged that the June 9, 1989 letters were sent in error. *Deposition transcript at p. 25.*

While declaring the loans in default was not justified, that is not to say that the Bank did not have reason to be concerned about the status of the loan. Only two units were sold in 1989 as compared to the twenty-one (21) sales in 1988. *Transcript dated April 22, 1994 at pp. 28–29.* The line of credit had almost reached its maximum of One Million One Thousand Dollars ($1,101,000.00). *Transcript dated April 21, 1994 at p. 59.* Ralph Cox, the Bank president who exercised sole supervision over the Plaintiff's loan, was involved in an automobile accident in May of 1989 and subsequently resigned on June 16, 1989.

It was during that time period that a special loan committee was established to examine into the Plaintiff's loan and that committee determined that the loan was administered improperly by Mr. Cox. *Tran-*script of Dingler Deposition at p. 64 (Plaintiff's Exhibit No. 7).

Nonetheless, the default letters were sent in error and resulted in the Bank terminating all funding from that date until September 7, 1990. *Transcript of Dingler Deposition at p. 69 (Plaintiff's Exhibit No. 7).*

The Bank was under a duty to give the Plaintiff a grace period under the contract. It's failure to perform that duty constitutes a breach of the contract. *Winstar Corp. v. U.S.,* 64 F.3d 1531, 1545 (CADC 1995) *citing Restatement (Second) of Contracts, § 346(2).*

We can only await the completion of the damages portion of this trial to determine the degree to which the Plaintiff has been impacted by this breach.

It is an "assumption of contract law that the principal purpose of the rules relating to breach is to place the injured party in as good a position as he would have been had the contract been performed." Under this principle, damages in contract are generally measured by the loss of economic expectancy the non-breaching party suffers as a result of the failure of performance plus any so-called incidental or consequential losses, minus any expenses saved. [Citations omitted.] *Coca–Cola Bottling Company of Elizabethtown, Inc. v. The Coca–Cola Company,* 988 F.2d 386, 409 (3rd Cir.1993) *citing Restatement (Second) of Contract §§ 346(2), 347.*

### 3. Default of the 1990 Modified Loan Agreement

■ Having determined that the June 9, 1989 default letters were premature and, thus, a breach of the contracts between the parties, we now turn to the circumstances under which the loan modification agreement ("MLA") of September 7, 1990 was declared in default.

The Plaintiff alleges that despite the loan modification agreement, the Bank refused to fund the construction costs of the remaining units being constructed by the Plaintiff. The Plaintiff identifies this as the prime reason the units were not built in timely fashion which, of course, impacted unfavorably on the Plaintiff's ability to market the units.

A summary of the Plaintiff's position can be found in footnote 5 of their trial brief on page 29.

Under the terms of the LMA[2], the Bank was required to make certain payments when unit closings occurred to the original sellers of the property who had subordinated their mortgage to the Bank. (Exhibit 45). The Bank made only one payment under the LMA. Since then the Bank has failed and refused to make these payments as required. In addition, the Bank was required under the LMA to pay six percent (6%) of the net closing proceeds to Clemens. Again, the Bank made only one such payment. Since then, the Bank has failed and refused to make these payments as required. (Clemens, Dingler, Keefer testimony, Exhibits 10, 7 and 9).

The Modified Loan Agreement provided that interest only would be payable on a quarterly basis commencing on the seventh day of December, 1990, and each quarter thereafter until August 31, 1993, when the full amount of the principal would be due. *Modified Loan Agreement at p. 5.* The last payment on that Modified Loan Agreement paid interest current through May 7, 1991. *Transcript dated April 21, 1994 at p. 156.* The next quarterly payment would have been due for August 7, 1991 and, "... [u]pon notification of any 'events of default' by bank to borrower, borrower shall have a period of ninety days to cure said default (grace uncured.)" *Modified Loan Agreement at p. 22.*

The only notification forthcoming from the Bank to the Plaintiff was the "Notice of Intention to Execute on Loan" sent by Bank's counsel to the Plaintiff dated September 19, 1991, giving the Plaintiff thirty (30) days to cure the default. *Plaintiff's Exhibit No. 52.*

We find that this notice was inadequate under the terms of the MLA. We further find that the letter of September 19, 1991 was the equivalent of a "notification" of an "Event of Default" as that term is described in Section 5.2 of the MLA.

This defective performance of a duty pursuant to the MLA constitutes a breach of contract. *Restatement (Second) of Contracts, § 235(2).* It remains to be established at the damage phase of the trial, the impact of this breach.

## C. NEGLIGENT MISREPRESENTATION AND FRAUD

■ Section 552 of the Restatement of the Law of Torts, Second, has been accepted as the law in Pennsylvania. *Rempel v. Nationwide Life Insurance Company, Inc.,* 471 Pa. 404, 370 A.2d 366 (1977). That section reads as follows:

§ 552. **Information Negligently Supplied for the Guidance of Others.**

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a. transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

■ Implicitly required as elements of the tort are (1) duty, (2) breach of duty, and (3) damages. *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 615 (3rd Cir.1987).

---

**2.** Identified throughout this opinion as the Modified Loan Agreement or MLA.

Applying our findings of fact to the elements of this tort, we agree with the Plaintiff that the Bank has committed itself to an extension of credit to the extent of One Million Three Hundred One Thousand Dollars ($1,301,000.00) to consist of a line of credit of One Million One Hundred One Thousand Dollars ($1,101,000.00) and a Two Hundred Thousand Dollar ($200,000.00) loan payable in six months. *Sterling Faucet Co. v. First Municipal Leasing Corp.*, 716 F.2d 543 (8th Cir.1983). Accordingly, we believe that this transaction can support the tort of negligent misrepresentation since the Two Hundred Thousand Dollar ($200,000.00) loan was not independently funded.

We further conclude that the defaults were prematurely declared. We make the finding that the defaults declared on both the original agreements of August 17, 1987 and the Modified Loan Agreement of September 7, 1990 were declared without the reasonable exercise of care and competence that should be expected of a bank official in making such declaration. Indeed, with regard to the June 9, 1989 defaults, the senior vice president, Lewis Dingler, who executed those default letters acknowledged that he did not even review the loan documents before issuing such correspondence. *Transcript dated April 21, 1994 at p. 62.*

The Plaintiff was the person for whose guidance this collective information (the Two Hundred Thousand Dollar ($200,000.00) loan contract and the default declarations) was supplied pursuant to Restatement of the Law of Torts, Second, § 552B(1) and the Plaintiff had every reason to justifiably rely upon those declarations.

The only element of the tort of negligent misrepresentation that is missing is an answer to the question as to whether the Plaintiff suffered harm. Since the trial to which we have addressed this opinion is a bifurcated one separating the issue of liability from the issue of damages, we can make no finding at this time as to whether the Plaintiff was harmed by the two premature declarations of default or the failure to advance the Two Hundred Thousand Dollar ($200,000.00) loan. With regard to that point, we will reserve judgment until the second phase of this litigation.

■ With reference to that Count of Plaintiff's complaint that alleges fraud on the part of the Bank, we look for guidance to the Pennsylvania Supreme Court case of *Linda Coal and Supply Company v. Tasa Coal Company*, 416 Pa. 97, 204 A.2d 451 (1964).

That case defines fraud as "... the misrepresentation of a material fact on which the other party relies to his injury." *Edelstein v. Carole House Apartments, Inc.*, 220 Pa.Super. 298, 302, 286 A.2d 658, 661 (1971).

■ Fraud is proven when it is shown that the false representation was made knowingly or in conscious ignorance of the truth, or recklessly without caring whether it be true or false. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983).

While we can easily conclude that both declarations of default were made negligently, we further conclude that the Plaintiff has not met its burden of establishing that these were false representations made knowingly or in conscious ignorance of the truth or recklessly by the Bank without caring whether it be true or false.

We, therefore, hold in favor of the Defendant–Bank with regard to the Count alleging fraud.

## D. INTENTIONAL INTERFERENCE WITH CONTRACT, INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

■ Those Counts of the complaint that allude to causes of actions sounding under Section 766 of the Restatement of the Law of Torts, Second, must now be considered by the court. Section 766 of the Restatement of the Law of Torts, Second, reads as follows:

§ 766. **Intentional Interference with Performance of Contract by Third Person.**

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to

perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Section 766B of the Restatement of the Law of Torts, Second, addresses intentional interference with prospective contractual relations and reads as follows:

### § 766B. Intentional Interference with Prospective Contractual Relation

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

While reading similar to Section 766, Section 766B concerns itself only with the intentional interference with prospective contractual relations, *not yet reduced to contract.*

The seminal case in Pennsylvania on Section 766 of the Restatement of the Law of Torts, Second, is *Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175 (1978). The linchpin of the Plaintiff's case with regard to the tort of intentional interference with contract centers around the Bank's refusal to fund the project despite their contractual obligations. "TCO's (The Clemens Organization) inability to pay his subcontractors or to complete sales of townhouses was the direct and proximate result of the Bank's wrongful and intentional interference." *Plaintiff's Trial Brief at p. 42.*

Plaintiff's argument misses the point that this tort makes one liable to another only if a *third* person is induced not to perform the contract. The specific allegation of this complaint may support liability to the subcontractors, but not to the Plaintiff.

■ With regard to the tort of intentional interference with prospective contractual relation, we turn to the case of *Glenn v. Point*

*Park College,* 441 Pa. 474, 272 A.2d 895 (1971), which concludes that Pennsylvania accepts this subsection of the Restatement. The elements of the tort are as follows:

1. A prospective contractual relation between the third party and the plaintiff;

2. The purpose or intent to harm the plaintiff by preventing the relationship from occurring;

3. The absence of privilege or justification on the part of the actor; and

4. The occurrence of actual harm or damage to plaintiff as a result of the actor's conduct. *Id.* at pp. 479, 272 A.2d at p. 898.

The Plaintiff alleges two instances of potential liability on the part of the Bank. The first involves the failure of the Bank to authorize the payment of various contractors of the Plaintiff owed money for work performed on the units in question. The second ground is the Bank's rejection of a possible sale of a unit to Art Borden for the sum of One Hundred Thirty–One Thousand Five Hundred Dollars ($131,500.00).

■ With regard to the contractors, we are simply unable to conclude that the Bank had the purpose or the intent to harm the Plaintiff by preventing this relationship that the Plaintiff had with his contractors from being fulfilled by payment. Regardless of whether the Bank was justified in declining to fund the payments made to the contractor, this can bear only on the element of "privilege" or justification. "It must be emphasized that . . . the actor [must be found to be] acting as he does for the purpose of causing harm to the plaintiff." *Glenn v. Point Park College, supra,* at p. 480, 272 A.2d at p. 898. Even though the failure to fund contractors payments obviously resulted in the Plaintiff having greater difficulty creating additional units for sale, the Plaintiff has not established that the Bank intended to harm the Plaintiff and, therefore, we conclude that this Count has not been established with regard to the contractors.

■ That brings us to the prospective relationship that was proposed between Art Borden and the Plaintiff as referenced more specifically in meeting notes set forth in Ex-

hibit No. 35. It was fairly clear in reviewing that exhibit that Mr. Borden was proposing the purchase of 104 Lakeside Drive for the sum of One Hundred Thirty One Thousand Five Hundred Dollars ($131,500.00) only on the condition that he would be paid a previous indebtedness that the Plaintiff owed to him. Since this fund to pay Arthur Borden would presumably be paid from loan proceeds or collateral proceeds, the Bank appears to have some explanation for declining the offer. Although this sale would result in a net reduction of the Bank's debt by approximately One Hundred Thousand Dollars ($100,000.00), that is apparently significantly less than the value of the unit. The Bank was justified in declining the offer and from that we can infer no inappropriate intent.

We conclude that the Plaintiff has failed to establish a cause of action with regard to intentional interference with prospective contractual relationships under Section 766B of the Restatement of the Law of Torts, Second.

## E. ABUSE OF PROCESS/WRONGFUL USE OF CIVIL PROCEEDINGS

■ Next, we address the Plaintiff's argument that he is entitled to a verdict based on abuse of process or the wrongful foreclosure of the Bank's mortgages against the Plaintiff.

Count VIII of the complaint alleges the tort of "abuse of process (wrongful foreclosure)".

The Plaintiff advances that foreclosure on its mortgage by the Bank was with actual malice and an intent to inflict financial harm and injury upon the Plaintiff motivated by a wrongful and ulterior intention of forcing the Plaintiff to abandon his development.

The Defendant, in its trial brief, argues that the Plaintiff has mischaracterized its cause of action as abuse of process rather than "malicious *use* of civil process".

Although it is clearly the Plaintiff's cause of action to win, lose or identify, we will differentiate the two torts and examine whether the facts support a verdict in either area.

The tort known as malicious use of process is often confused with another tort of a deceptively similar name, abuse of process. Abuse of process occurs when the legal process is utilized for some unlawful purpose, and not for which it was intended. Malicious use of process is a separate and distinct tort which arises when a party institutes a lawsuit with a malicious motive and lacking probable cause [citations omitted]. *Dietrich Industries, Inc. v. Abrams*, 309 Pa.Super. 202, 206, 455 A.2d 119, 122 (1982).

The malicious use of process is now identified as wrongful use of civil proceedings by statute.

### § 8351. Wrongful use of civil proceedings

(a) Elements of action.—A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:

(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2) The proceedings have terminated in favor of the person against whom they are brought.

(b) Arrest or seizure of person or property not required.—The arrest or seizure of the person or property of the plaintiff shall not be a necessary element for an action brought pursuant to this subchapter. 42 Pa.C.S.A. § 8351.

The Plaintiff was admittedly in arrears. While a foreclosure was probably initiated, there appears to be no reference on the record to the initiation of such action. Moreover, there is no evidence on this record that "the proceedings have terminated in favor of the person against whom they are brought".

There appears to be no support for the statutory tort of wrongful use of civil proceedings on this record.

■ Turning our attention to the tort of abuse of process, we first find that malicious abuse of process concerns an improper

use of civil process *after* an action has been instituted. *Garcia v. Wall & Ochs, Inc.*, 256 Pa.Super. 74, 75, 389 A.2d 607, 608 at fn. 2 (1978).

To establish a common law cause of action for abuse of process "some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required." ... The touchstone of the action is a perversion of the process for a purpose for which it was not intended. [Citations omitted.] *Neill v. Eberle*, 153 Pa.Cmwlth. 181, 185, 620 A.2d 673, 674 (1993).

Plaintiff argues in its proposed findings of fact and conclusions of law and supporting arguments as follows.

Clemens has shown the following:

(1) The Bank foreclosed on its mortgage with actual malice and with an intent to inflict financial harm and injury upon Clemens and with the wrongful and ulterior motive of forcing him to abandon his real estate development; and

(2) As a result of the Bank's abuse of process, Clemens was forced to file for protection under the Bankruptcy Code and has suffered substantial damages.

52. The Bank's institution and continuation of the foreclosure proceedings was wrongful and/or unlawful because the Bank had the ulterior motive of forcing Clemens to abandon his real estate development. Following the Bank's wrongful declaration of default and its subsequent failure to fund further construction at the Project, the Bank immediately began formulating strategies to foreclose on the Project, liquidate the collateral, obtain new collateral and/or take over the Project entirely. (Findings 122–147). Clemens has shown the Bank's ulterior motive and the Bank's use of the foreclosure proceedings for a purpose other than that for which they were designed. *Gilbert v. Feld*, 788 F.Supp. 854 (E.D.Pa.1992). Consequently, plaintiffs are entitled to judgment on this Count. *Plaintiff's Proposed Findings of Fact, Conclusions of Law and Supporting Arguments, filed August 5, 1994, at p. 101.*

In understanding this tort, we turn to one of the leading treatises on the subject.

The essential elements of abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in a proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort. *Prosser on Torts, 3rd Ed., § 115 at p. 877.*

The Plaintiff argues that the Bank intended to inflict financial harm and injury upon the Plaintiff and wanted to force him to abandon his real estate development.

We agree that there was bad judgment exercised by the Bank in enforcing the terms of its loan with the Plaintiff. Moreover, we find the Bank regretted making the loan, one of the largest in its portfolio. *Transcript of Dingler Deposition at p. 16 (Plaintiff's Exhibit No. 7).* We further find the Bank was anxious to terminate its relationship with the Plaintiff and was intent on exercising its rights under the loan documents to the extent those rights existed so they would not suffer any greater exposure than they already had.

We cannot find that the Bank's intent was to hurt the Plaintiff's financial health or to, per se, deprive him of his real estate development. While the Bank may have regretted their obligation, the Bank has shown no animosity toward the Plaintiff. Neither has the Plaintiff demonstrated that the Bank pursued any foreclosure litigation for an improper purpose. The Bank was merely attempt-

ing to recover a debt owed to it. This was the exact purpose for which a foreclosure action would be intended. *Dietrich Industries, Inc. v. Abrams*, 309 Pa.Super. 202, 211, 455 A.2d 119, 124 (1982). These facts do not support a cause of action for abuse of process.

### F. EQUITABLE SUBORDINATION

■ The Plaintiff maintains that the Bank's claim should be equitably subordinated by reason of their conduct. This is a statutory remedy provided for by the provisions of 11 U.S.C. § 510(c), which reads as follows:

### § 510. Subordination.

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

■ While the cornerstone of the Plaintiff's claim relies on the alleged inequitable conduct of the Bank, our circuit has diminished the role that improper conduct plays by holding that creditor misconduct is not a prerequisite for a claim under Section 510(c)(1). In this regard, a court should consider the equities of the various claimants. *Burden v. United States*, 917 F.2d 115 (3rd Cir.1990).

Notwithstanding this holding, the Plaintiff has not attempted to broadly identify the various claimants in the estate so as to subordinate this Bank's claim vis-a-vis those claimants. Rather, the Plaintiff has relied on more traditional concepts of equitable subordination by pointing to the "inequitable conduct" of the Bank administering this loan.

The courts applying the traditional application of equitable subordination have required the existence of three elements as follows: first, the claimant must have engaged in some type of inequitable conduct; second, the misconduct must have resulted in injury to the creditors, the debtor, or given them some unfair advantage over the claimant; and third, the subordination of the claim cannot be inconsistent with existing bankruptcy law. *In re M. Paolella & Sons, Inc.*, 161 B.R. 107, 116 (E.D.Pa.1993) aff'd 37 F.3d 1487 (3rd Cir.1994).

*Paolella* goes on to suggest that there are three categories of inequitable conduct.

(1) fraud, illegality, or breach of fiduciary duties;

(2) undercapitalization; and

(3) claimant's use of the debtor as a mere instrumentality or alter ego. *Id.* at p. 118 citing *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d 693 at 699 (5th Cir.1990).

■ The burden of establishing inequitable conduct differs depending on whether the party holding the claim is an insider or a non-insider.

Where the claimant is an insider or a fiduciary, the trustee bears the burden of presenting material evidence of unfair conduct. Once the trustee meets his burden, the claimant then must prove the fairness of his transactions with the debtor or his claim will be subordinated. If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud, spoliation or overreaching, and prove it with particularity. *Id.* at p. 118 citing *In re N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986).

The court in *Paolella* astutely pointed out that whether an entity was an insider required more than an examination of the statutory definition of such in 11 U.S.C. § 101(31), but rather required an analysis as to "... whether the party has attained fiduciary status by exercising control of the debtor." *Id.* at p. 118.

That court carefully pointed out, however, that "... a creditor does not act inequitably in exercising its contractual rights...:. [since there can be] no subordination where there was no evidence that the creditor 'exceeded its authority under the loan agree-

ment or that [the creditor] acted inequitably in exercising its rights under that agreement.' Our attention has not been called to any case wherein a court has equitably subordinated the claim of a non-insider who adhered to the terms of a loan agreement". *Id.* at p. 120.

■ With this background, we must first examine whether the Bank exercised such control over the Plaintiff's affairs that it became a fiduciary of the Plaintiff.

Undoubtedly, there was significant evidence that the Bank controlled much of the affairs of the Plaintiff during some significant time periods. Nevertheless, it never appeared to approach the point where the Bank assumed the identity of the Plaintiff by exerting that type of overwhelming compliance with its directives. While the Plaintiff may not have been in technical default of its obligations, there were significant periods of time when the Plaintiff was in delinquent or past-due status, which motivated the Bank to take a cautious and conservative approach in its affairs with the Plaintiff. We simply cannot find such control as to allow us to make a finding that the Bank was an insider of the Plaintiff. *Id.* at p. 118.

Having concluded that the Bank was a non-insider, the Plaintiff is left the burden of proving, with particularity, the egregious conduct that would require subordination. The Plaintiff alleges that the following instances are representative of the Bank's inequitable conduct.

1. The Bank's admittedly wrongful declaration of Clemens' default under the loan documents (where no such default existed and without even consulting the loan documents);

2. Its admitted failure to fund further construction for over a year based upon the wrongful declaration of default;

3. The Bank's knowledge of the uncompleted condition of Project at time of discontinuance of funding;

4. Its wrongful institution of foreclosure proceedings against real property which secured the loans which provided funding for the Project;

5. Its domination and control of the Project's finances and its bad faith refusal to allow construction of the Project to proceed on schedule to completion;

6. The documented fact that the Bank first committed to increase the loan availability from $1,101,000.00 to $1,301,000.00 and then reneged which resulted in the decrease of the loan availability by $200,000.00;

7. The Bank's requirement that Clemens liquidate his and his family's assets to pay the Bank $438,000.00 as a precondition to executing a Loan Modification Agreement;

8. The Bank's failure to live up to the terms of the LMA;

9. The Bank's misapplication of Clemens' $6,600.00 payment as an advance against the loan which, according to the Bank, pushed the loan over the limit. This misapplication went unchecked for over a year;

10. The Bank's requirement that Clemens and Harris assign life insurance policies in the amount of $200,000.00 each to the Bank and later in the amount of $500,000.00 for Clemens alone;

11. The Bank's obstruction of sales of units at the Project which would have benefitted the Bank;

12. The Bank's meeting with creditors to take over and build out the Project after Clemens was forced by the Bank to file for bankruptcy. *Plaintiff's Trial Brief, filed November 1, 1993, at pp. 34–35.*

■ What is lost in this summary of the alleged inequitable conduct of the Bank is an appreciation by the Plaintiff that the victim of inequitable conduct is not the debtor per se, but the other creditors. The Plaintiff has shown neither injury to the creditors nor "unfair advantage" to the Defendant. See *In re M. Paolella & Sons, Inc.,* *supra* at p. 116. If the Plaintiff has been wronged, he has ample opportunity to establish same in this forum either contractually, in tort, or under other equitable theories. Equitable subordination, as that term is understood under 11 U.S.C. § 510(c), addresses the ability of a bankruptcy court to realign the distributive priorities otherwise set forth

by federal bankruptcy law as well as state law.[3] This is typically a creditor remedy sometimes exercised by the debtor in its fiduciary capacity. It is not a remedy that can be implemented by a debtor to favor a debtor. "As a matter of equity, it is reasonable that a court subordinate claims to claims and interests to interest." *124 Cong.Rec. H11,095 (Sept. 28, 1978); S17,412 (Oct. 6, 1978)*. We thus conclude that the Plaintiff cannot prevail on its claim for equitable subordination except as it may address the inequities toward other creditors, a matter not addressed by the trial.

## G. GOOD FAITH

▆ The Plaintiff alleges that the Bank has breached an implied duty of good faith by wrongfully refusing to fund the project under the construction loan agreement and under the Modified Loan Agreement. The Plaintiff asserts that the implied duty of good faith and fair dealing is breached "... when a party acting in bad faith fails to perform its express obligations under the contract." *Plaintiff's Trial Brief at p. 48.*

The Plaintiff alleges the same twelve (12) instances of a breach by the Bank of its duty of good faith and fair dealing as he cited as representative of the Bank's inequitable conduct. *See p. 796 of this Opinion.*

The seminal case on good faith under Pennsylvania law is *Creeger Brick and Building Supply Inc. v. Mid–State Bank and Trust Company, SEDA*, 385 Pa.Super. 30, 560 A.2d 151 (1989). *Creeger* acknowledges that the duty of good faith has been recognized in the Commonwealth of Pennsylvania in limited situations. *Id.*, 560 A.2d at p. 153. That case cites to Section 205 of the Restatement for the proposition that "...[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Id.*, 560 A.2d at p. 153.

The *Creeger* case involved a borrower suing its lending bank for failing to provide Creeger with a line of credit, over-collateralizing its loan, establishing a commercially unreasonable method in which Creeger was required to draw upon borrowed funds, etc. After an analysis of the law in Pennsylvania, the *Creeger* court wrote as follows:

It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons. A lending institution also is not required to delay attempts to recover from a guarantor after the principal debtor has defaulted. Finally, if the bank in this case falsely represented appellants' financial circumstances to other creditors for the purpose of damaging appellants' ability to continue doing business, appellants may have causes of action in tort for slander, misrepresentation, or interference with existing or prospective contractual relations. There is no need in such cases to create a separate tort for breach of a duty of good faith. *Id.*, 560 A.2d at p. 154.

While not categorically denying the existence in Pennsylvania of a tort for breach of a duty of good faith, the *Creeger* court suggested that its application was extremely limited and would probably only be allowed on occasions where a party had no other redress for a harm caused by the inequitable conduct of a defendant.

Further supporting this conclusion is *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685 (3rd Cir.1993), wherein our circuit predicted that "... the Pennsylvania

---

**3.** "... [t]he court may ... subordinate ... all or part of an allowed claim to all or part of another allowed claim." 11 U.S.C. § 510(c).

Supreme Court would not extend the limited duty of good faith to a situation such as the one at bar in which *there already exists an adequate remedy at law.*" [Emphasis ours.] *Id.* at p. 701.

The circuit concluded that since the Plaintiff could seek relief under an established cause of action, there was no reason to imply a separate tort for breach of a duty of good faith since Pennsylvania would probably not· imply such a duty "... in an action which already subsumes it." *Id.* at fn. 8.

The duty of good faith appears to be one of implication that one will pursue whatever course reasonably necessary to carry out the terms of a given contract. "... [A] promise to do an act necessary to carry out the contract must be implied." *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 701 (3rd Cir.1993).

▮ Notwithstanding that approach, this duty of good faith cannot override the express terms of a contract. *Coxfam, Inc. v. AAMCO Transmissions,* 1990 WL 131064 at p. 5 (E.D.Pa.1990).

In a similar vein, the Supreme Court of Pennsylvania has decline to judicially create a cause of action where a statute provided adequate redress stating "... it is equally for the Legislature to determine whether sanctions beyond those created under the Act are required to deter conduct which is less than scrupulous." *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Company,* 494 Pa. 501, 508, 431 A.2d 966, 970 (1981).

While the statute in that case was the Unfair Insurance Practices Act, the Plaintiff here has asked that the Bank's claim be equitably subordinated under 11 U.S.C. § 510(c) of the Bankruptcy Code, which authorizes this court to subordinate for purposes of distribution all or part of an allowed claim to all or part of any other allowed claim. As interpreted by our circuit, this equitable subordination can be accomplished even if we were to find no inequitable conduct on behalf of the Bank. *Burden v. United States of America,* 917 F.2d 115 (3rd Cir.1990). This leads to the conclusion that

it would be rare, indeed, for a Pennsylvania bankruptcy court to recognize the tort for breach of a duty of good faith ·in favor of a debtor and against a creditor when there are other tools so readily available to penalize a creditor. In fact, we have found that the Plaintiff has prevailed on theories of breach of contract and may possibly prevail on the Count of negligent misrepresentation. Since the Plaintiff has redressed its concerns, there is no need to offer him the avenue of this separate tort.

The cases we have cited regarding the tort for breach of good faith would not be applicable in a case under the Uniform Commercial Code, which imposes a statutory duty of good faith upon the parties. See, for example, *Skeels v. Universal C.I.T. Credit Corporation,* 335 F.2d 846 (3rd Cir.1964).

While acknowledging the Plaintiff's position that the Uniform Commercial Code has a similar provision[4], there is no apparent justification for applying the Uniform Commercial Code to the transactions before us, which appear to clearly be outside of the scope of the U.C.C. In summary, there is no statutory duty of good faith applicable here.

### CONCLUSION

In summary, we conclude that the Plaintiff has established that the Bank has breached the contract (Count II) and may be further liable on grounds of negligent misrepresentation (Count III).

Our Order is attached.

### ORDER

For the reasons indicated, we enter judgment in favor of the Plaintiff and against the Defendant on Count II of the complaint (Breach of Contract). We further reserve judgment on Count III (Negligent Misrepresentation) pending the conclusion of the second phase of this trial. Judgment on the remaining Counts is rendered in favor of the Defendant.

4.   13 Pa.C.S.A. § 1203.

APPENDIX

Christopher J. Clemens
317 Market Street
Lewisburg, PA 17837
March 3, 1988

Mr. Ralph Cox, President
West Milton State Bank
West Milton, PA 17886

    RE:  Clemens–Harris Partnership

Dear Mr. Cox:

Your bank has offered financial accommodations to me in the amount of $200,000.00 to enable me to purchase the interest of my partner, Norman E. Harris, in The Clemens–Harris Partnership.  In addition to the collateral which your bank and First National Trust Bank of Sunbury holds, you have requested a collateral mortgage on property in Milton owned by my brother, David P. Clemens, situate on Mahoning Street, Milton, Northumberland County.  The collateral mortgage is to be written in the amount of $218,000.00.  My brother has no interest in The Clemens–Harris Partnership or my purchase thereof, and he is concerned about the release of the mortgage when certain conditions have been met.

After discussions between you and me, it is my understanding that there is presently recorded a mortgage obligations in favor of West Milton State Bank in the amount of $1,101,000.00.  When your bank makes the financial accommodations to me to purchase my partner's interest in the amount of $200,-000.000, the total obligation would have a face amount of $1,301,000.00.  I have in the past furnished certain pro forma financial statements to you indicating that at the end of phase three of the project, (completion and sale of 24 condominium units), the approximate remaining mortgage will be $250,000.00, with $1,051,000.00 having been repaid to the bank.  At that time, it is my understanding that the collateral mortgage on the property owned by my brother and I in Milton will be released.

We are presently approaching the end of phase two of the condominium project (completion and sale of the first 16 condominiums units) and at the completion of phase two, we will have paid back to the bank approximately $900,000.00.  Therefore, upon the completion of the phase three condominium units and the sale of approximately two or three of those units, we will have achieved the pay back to the bank of approximately $1,051,-000.00.  It is my understanding that at that time, and as stated above, that the collateral mortgage on the Milton property will be released.

Please confirm my understanding of the release arrangement by placing your signature in the space provided below.

        Sincerely,
        /s/ <u>Christopher J. Clemens</u>
        Christopher J. Clemens

CJC/mrb

The terms and conditions of this release will be met by the bank provided, of course, all accounts at that time by Mr. Clemens are current.

The West Milton State Bank hereby approves the release arrangements set forth above.

      /s/ <u>Ralph J. Cox</u>
      Ralph J. Cox, President